[Cite as *Verhoff v. Verhoff*, 2019-Ohio-3836.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

DAVID VERHOFF,

    PLAINTIFF-APPELLEE,                 CASE NO. 1-18-66

    v.

PHILIP G. VERHOFF,

    DEFENDANT-APPELLANT,

    -and-                                O P I N I O N

SANDRA VERHOFF,

    DEFENDANT-APPELLEE.

---

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CV 2016 0592**

**Judgment Affirmed**

**Date of Decision:  September 23, 2019**

---

**APPEARANCES:**

    *William E. Clark* **for Appellant**

    *Jared J. Lefevre* **and** *Charles E. Sulek* **for Appellee, David Verhoff**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Philip G. Verhoff ("Philip") appeals the judgment of the Allen County Court of Common Pleas, alleging that the trial court erred by denying his motion for a directed verdict and that the jury entered a verdict against the manifest weight of the evidence. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Martha M. Verhoff ("Martha") owned a farm on Schooler Road ("the Schooler Farm") but died in 2006. Tr. 78, 165. Martha, who was predeceased by her husband, had five children who survived her: David G. Verhoff ("David"); Philip; Barbara Verhoff ("Barbara"); Susan Morris ("Susan"); and Mary Ann Nickles ("Mary Ann"). Tr. 80. In her will, Martha named David as the executor of her estate. Tr. 79. At some point, David began to discuss the future of the Schooler Farm with his sisters and his brother, Philip. Tr. 80.

{¶3} The siblings eventually came to an agreement regarding the disposition of the Schooler Farm. The parties to this action agree that the siblings approved a private sale of the Schooler Farm for a purchase price of $135,000.00. Tr. 87-88, Ex. 8. The five siblings also agreed that each of them would then receive an equal share of roughly $27,000.00 from the proceeds of this sale. Tr. 87-88. Ex. 8, 10. Aside from these general details, however, David and Philip present different accounts of the terms of the sale of the Schooler Farm.

-2-

{¶4} According to David, the siblings agreed that Philip and David would purchase the Schooler Farm in order to keep this property in the family. Tr. 80. However, the estate's attorney advised David that he, as the executor of Martha's estate, should not purchase assets directly from the estate. Tr. 80. At trial, David testified that his attorney suggested that Philip purchase the Schooler Farm; that David, as executor, transfer the deed to the Schooler Farm under Philip's name; and that Philip, at a later date, transfer a deed to a one-half interest in this property to David . Tr. 80, 87, 93, 105-106.

{¶5} Pursuant to his attorney's advice, David sent a $67,500.00 check to Philip for one-half the purchase price of the Schooler Farm with the intention of purchasing a one-half interest in the Schooler Farm. Tr. 82-83. Ex. 1. The memo line on this check read: "1/2 For moms Farm." Tr. 83. Ex. 1. On May 9, 2007, Philip sent an email to David that read: "David - your check arrived today 5/9/07, will hold it until further direction." Tr. 85. Ex. 4. David then told Philip to send a check for $135,000.00 to the estate's attorney in order to purchase the Schooler Farm from the estate. Tr. 86. David, as executor of Martha's estate, signed over the deed to the Schooler Farm to Philip with the understanding that Philip, at a later date, would transfer a deed to a one-half interest in this property to him. Tr. 86-87. Ex. 7.

{¶6} According to Philip, however, he never entered into an agreement with his brother under which David would receive a one-half interest in the Schooler Farm and that he was to be the sole purchaser of the Schooler Farm. Tr. 170-171, 177, 184. Philip testified that he had access to sufficient funds to pay the entire $135,000.00 but that some of the funds were in stocks that would have taken a "few days" to liquidate. Tr. 249. Philip stated that David wanted the purchase money as soon as possible and that David stated he would loan Philip one-half of the purchase price to speed up this process. Tr. 180-181, 249.

{¶7} Philip testified that he did receive a $67,500.00 check as a loan from David but noticed that David had written "1/2 For moms Farm" on the memo line. Tr. 182. Ex. 1. Philip stated that he called his brother to inquire about the message on the memo line and that David reaffirmed that this sum was intended as a loan. Tr. 173, 182, 228. Thus, according to Philip, the deed to the Schooler Farm is in his name alone because he was the sole purchaser and is the sole owner of this property.

{¶8} After the purchase of this property, the Schooler Farm was leased to a farmer. Tr. 94. Ex. 9. In January of 2007, David and Philip had opened a joint bank account. Tr. 95. Ex. 9. Philip testified that David opened the joint account with him in case anything happened to David prior to completing the process of probating Martha's estate. Tr.168-169. Philip testified that he deposited rental income into the joint account as payments on the $67,500.00 loan from David. Tr. 243. Philip acknowledged that David paid the property taxes and utilities for the

Schooler Farm but stated that he did not like that David was paying these bills. Deposition Tr. 46.

{¶9} David, on the other hand, testified that this account was opened to facilitate the joint operation of the Schooler Farm. Tr. 95. David further testified that Philip deposited all of the rental income from the Schooler Farm into this account. Tr. 95. Ex. 21. David also stated that he (David) used the funds in this account to pay for the utility bills and property taxes for the Schooler Farm. Tr. 96, 189, 246. David stated that Philip would pay the income taxes on the rental income on this property. Tr. 107. David stated that this working arrangement continued for roughly eight years. Tr. 94.

{¶10} In 2015, David began to engage in some estate planning. Tr. 76-77. During this process, his attorney recommended that David obtain a deed that represented ownership of a one-half interest in the Schooler Farm. Tr. 97. David then requested a deed from Philip. Tr. 97. On December 7, 2015, Philip deposited roughly $61,000.00 into the joint account. Tr. 98, 207. At trial, Philip claimed that he deposited this sum in the joint account to finish repaying the $67,500.00 that David had allegedly loaned him in 2007. Tr. 206. From this point forward, Philip withheld the rental income from the Schooler Farm and refused to deposit these funds into the joint bank account. Tr. 97, 103, 211.

{¶11} On October 12, 2016, David filed a complaint against Philip, alleging that David entered into an oral contract with Philip for the purchase of the Schooler

Farm; that David, under this agreement, obtained a one-half interest in the Schooler Farm; that Philip asserts full ownership of the Schooler Farm in breach of this agreement; and that Philip withheld this property's rental income from David. Doc. 1. This complaint raised claims of breach of contract and conversion. Doc. 1. On October 16, 2018, this matter came to trial. Tr. 1.

{¶12} At the trial, David presented a copy of the $67,500.00 check that he wrote to his brother in 2007. Tr. 82. Ex. 1. The memo line of this check said "1/2 For moms Farm." Tr. 83. Ex. 1. David also presented a copy of his bank statement from May of 2007. Ex. 2. This statement showed a withdrawal of $67,500.00 on May 15, 2007. Ex. 2. The check number next to this withdrawal matched the number on the check that he tendered to his brother. Tr. 85. Ex. 1, 2. He also testified that he, like Philip, has keys to the house on the Schooler Farm but that none of their other siblings do. Tr. 100.

{¶13} However, Philip claimed that he was the sole purchaser and owner of the Schooler Farm as he and David had never made an agreement to purchase this property together. Tr. 170. In support of his claim, Philip testified that he was listed as the sole owner on the deed to the property; that the insurance on the property was in his name; and that he claimed the income from the farm on his taxes. Tr. 208, 210. He also testified that he and his wife maintained the farm while David did not contribute to the upkeep of the property. Tr. 216-217.

{¶14} Philip also stated that David had told him that the $67,500.00 check was a loan for the purchase of the property. Tr. 225, 228. He testified that he deposited the rental income from the farm as payments on this loan and that he completed the payments to his brother in December of 2015 when he deposited $61,000.00 into the joint account. Tr. 206-207, 243. Since the alleged loan was paid off, Philip withheld the rental income from the joint account. Tr. 211. Philip stated that David asked if he could purchase the Schooler Farm in 2015 and that he (Philip) had denied this request. Tr. 261. Philip also testified that David never asked for a deed before 2015. Tr. 261.

{¶15} On October 18, 2018, the jurors found that David and Philip had a contract under which each owned a one-half interest in the Schooler Farm; that Philip breached this contract; and that Philip converted rental income from this property. Doc. 47. In 2018, the Schooler Farm was valued at $311,377.00. Ex. 17. Tr. 144. Further, Philip had withheld $32,000.00 of rental income from David. Tr. 103. On October 30, 2018, the trial court awarded David $171,688.50 in damages. Doc. 52. This figure represented one-half the value of the Schooler Farm added to one-half the value of the withheld rental income. Doc. 52.

{¶16} On October 31, 2018, Philip filed a motion for a judgment notwithstanding the verdict. Doc. 53. He alleged that this agreement did not comply with the statute of frauds; that this action was barred by the statute of limitations; and that the agreement between him and David was an illegal contract. Doc. 53.

Case No. 1-18-66

On November 19, 2018, the trial court denied Philip's motion for a judgment notwithstanding the verdict. Doc. 60. The appellant filed his notice of appeal on November 28, 2018. Doc. 62. On appeal, he raises the following five assignments of error:

**First Assignment of Error**

**The trial court erred in denying Defendants' motion for a directed verdict based upon the affirmative defense of the statute of frauds.**

**Second Assignment of Error**

**The trial court erred in denying Defendants' motion for a directed verdict based upon the affirmative defense of the statute of limitations.**

**Third Assignment of Error**

**The trial court erred in denying Defendants' motion for a directed verdict based on the affirmative defense of illegality of contract.**

**Fourth Assignment of Error**

**The trial court erred in denying the Motion JNOV and/or for a new trial.**

**Fifth Assignment of Error**

**The verdict of the jury is against the manifest weight of the evidence.**

*First Assignment of Error*

**{¶17}** The appellant asserts that the alleged agreement between Philip and David did not comply with the statute of frauds.

Legal Standard

**{¶18}** R.C. 1335.05 contains Ohio's statute of frauds, which reads, in its relevant part, as follows:

> **No action shall be brought whereby to charge the defendant * * * upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.**

R.C. 1335.05. Generally, "[a]greements that do not comply with the statute of frauds are unenforceable." *First Merit Bank, N.A. v. Inks*, 138 Ohio St.3d 384, 2014-Ohio-789, 7 N.E.3d 1150, ¶ 20, quoting *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, 909 N.E.2d 93, ¶ 32.

**{¶19}** However, under certain conditions, an oral contract regarding the sale or lease of real estate may be removed from the statute of frauds pursuant to the doctrine of partial performance. *Hodges v. Ettinger*, 127 Ohio St. 460, 466-467, 189 N.E. 113 (1934).

> **Partial performance sufficient to remove a contract from the operation of the statute of frauds [1] 'must consist of unequivocal acts by the party relying upon the agreement, [2] which are exclusively referable to the agreement and [3] which have changed his position to his detriment [4] and make it impossible**

> **or impractical to place the parties in statu [sic] quo.'** *U.S. Bank v. Stewart*, **7th Dist. Columbiana No. 12 CO 56, 2015-Ohio-5469, ¶ 27, quoting** *Delfino v. Paul Davies Chevrolet, Inc.*, **2 Ohio St.2d 282, 287[, 209 N.E.2d 194] (1965).**

*JP Morgan Chase Bank, N.A. v. Spears*, 3d Dist. Shelby No. 17-17-10, 2018-Ohio-917, ¶ 14. "The doctrine of part performance should only operate as an exception to the Statute of Frauds when the acts relied upon as part performance are 'such as change the plaintiff's position and would result in a fraud, injustice, or hardship upon him if the contract were not executed or enforced.'" *Hall v. Light*, 4th Dist. Lawrence No. 1445, 1980 WL 351104, *2 (Oct. 21, 1980), quoting *Delfino*, *supra*, at 199, quoting 49 Am. Jur. 732, Sec. 427.

{¶20} "What constitutes part performance, however, depends ultimately on the particular facts of each case." *Osborne Bros. Welding Supply, Inc. v. Akron Truck Rental, Inc.*, 9th Dist. Summit No. 10587, 1982 WL 5094, *1 (July 14, 1982), quoting 25 Ohio Jurisprudence 2d 286-287, Frauds, Statute of, Section 193.

> **There are generally three criteria for establishing part performance: '(1) evidence of a change in who possesses the land, (2) payment of all or part of the consideration for the land, and (3) improvements, alterations or repairs upon the land.' Accord 51 Ohio Jurisprudence 3d (1984) 320, Frauds, Statute of, Section 171. Generally, the performance of only one of the three acts is insufficient to establish part performance.**

*Areawide Home Builders, Inc. v. Hershberger Const.*, Inc., 9th Dist. Summit No. 18514, 1998 WL 65476, *3 (Feb. 4, 1998), quoting *Geiger v. Geiger*, 2d Dist. Montgomery No. 13841, 1993 WL 476247, *4 (Nov. 16, 1993). *See Kaiser v.*

*Caskey*, 6th Dist. Lucas No. L-01-1487, 2002-Ohio-4082, ¶ 16; *Ribovich v. Miele Bros, Enterprises, Inc.*, 8th Dist. Cuyahoga Nos. 76137 and 76182, 1999 WL 1087481, *4 (Dec. 2, 1999); *DeAscentisi v. Margello*, 10th Dist. Franklin No. 08AP-522, 2008-Ohio-6821, ¶ 26.

{¶21} "A party seeking to enforce an oral land contract must establish both the contract and the applicability of the doctrine of part performance by clear and convincing evidence." *Watts v. Fledderman*, 1st Dist. Hamilton No. C-170255, 2018-Ohio-2732, ¶ 24; *Geiger* at *2; *Bumgarner v. Bumgarner*, 4th Dist. Highland No. 09CA22, 2010-Ohio-1894, ¶ 27; "Determining whether the trial court correctly applied the statute of frauds and the doctrine of partial performance is a matter of law." *Crilow v. Wright*, 5th Dist. Holmes No. 10 CA 10, 2011-Ohio-159, ¶ 27. Accordingly, appellate courts will apply a de novo standard of review to these matters. *Ruhe v. Hemmelgarn*, 2d Dist. Darke No. 96-CA-1423, 1997 WL 476687, *3 (Aug. 22, 1997); *LHPT, L.L.C. v. Capitol City Cardiology, Inc.*, 2014-Ohio-5247, 24 N.E.2d 712, ¶ 21 (10th Dist.).

Legal Analysis

{¶22} At trial, David alleged that he entered into an oral contract with Philip that had four main components: (1) David would pay Philip $67,500.00 for one-half of the Schooler Farm; (2) Philip would purchase this property from Martha's estate; (3) Philip, at a later date, would deliver David a deed for a one-half interest in the Schooler Farm; and (4) David and Philip would contribute to the costs of

maintaining the property and share the rental income. Doc. 1. We will first examine the record to determine if David carried the burden of proving that this oral contract existed. We will then examine whether the doctrine of partial performance removes this oral contract from the operation of the statute of frauds.

{¶23} To establish the existence of an oral contract, David introduced his various correspondences, with his siblings, relative to the farm. In an email to David on March 12, 2007, Philip wrote:

> **David – What you have is fine, here is a different approach/other thought that perhaps you can use when talking to the girls.**
>
> **\* \* \***
>
> **I came up with about 135k for an offer price resulting in a payment of 27k to each party \* \* \*. The thing to stress here is that more than likely the sale price will be even less than the asking price given the current state of the economy \* \* \*. SO your bottom line is very similar to what I had perceived to be a fair offer (but even at that we are suckers unless we discover gold or oil).**
>
> **Barb – she would have some sentimental interest in keeping it in the family…but she would probably prefer to sell it to Mary Ann & Jimmy. Furthermore, she has no idea what its really worth \* \* \*. I can hear the stories already how *David and Philip* "stole" the farm. \* \* \***
>
> **Susan – I would suspect that she would be more inclined to just have you put it on the market as well and get the highest bid…thinking that there is a bigger sucker than you and I out there. \* \* \* Plus I think she would like the idea of getting the cash fast from you and I instead of waiting for a year for a sale that might end up being for even less.**

> **Mary Ann * * * - Mike would like to get his hands on it and sell it in parcels to make a quick buck, with no regard for our parents or what they would like. * * * So who do you think dad and mom would sell it to, me/you or Mike. * * ***
>
> **SO THREE OUT OF FIVE IS A SALE…YOU WILL NEVER BE ABLE TO MAKE EVERYONE HAPPY. IF my math is right we would need to pull about 10k out of our back pockets to close the deal…in addition to the 30k inheritance/cash * * *. You might want to remind the girls that some of those repairs are mandatory in order to prevent YOU from getting sued if there is a direct sale to someone outside of the family.**
>
> **\* \* \***
>
> *David and Philip* **will offer to buy for 10% Less than appraisal. As buyer they will pay closing cost. 1/5 each person would get 26777.10**

(Emphasis added.) Ex. 18. At trial, the first and final fiduciary's account of Martha's estate was entered into evidence. Ex. 10. The record of receipts and disbursements that showed the Schooler Farm sold for $135,000.00 on June 1, 2007 and that each of Martha's five children received a $27,000.00 distribution on June 13, 2007. Ex. 10. Thus, Philip, in this email, outlined the terms of the eventual sale of the Schooler Farm and expressly characterized this offer as being from him *and* David. Ex. 18.

**{¶24}** David also introduced a hand-written message from Mary Ann that read, in its relevant part, as follows: "David, I agree to the offer *you and Philip* made at $147,825.00 plus closing costs." (Emphasis added.) Ex. 3D. At trial, David was

asked why Mary Ann mentioned a $147,825.00 sale figure when the farm sold for

$135,000.00. David testified that these numbers did not match

> **[b]ecause we agreed to buy the farm for ten percent less than the market value. When you take the real estate costs and everything off of it it comes to one thirty-five. That was the agreement everybody made. Mary Ann did agree to that, too. She was fine with the twenty-seven thousand she got.**

Tr. 91. Further, in an email to David and Philip on April 10, 2007, Barbara wrote:

"I am going to sign the paper [a sale of farm form] for *you two* to buy the farm—it

will be coming in the mail." (Emphasis added.) Ex. 3B. David also submitted a

copy of the sale of farm form that was signed by Barbara and dated April 10, 2007.

Ex. 3A. On this document, Barbara wrote that she agreed to the sale of "the farm

to David and Philip." Ex. 3A.

{¶25} David testified that, of the $67,500.00 that he sent to Philip,

$50,000.00 of this amount was from a trust account. Tr. 99. After withdrawing this

sum of money, the trust sent David a letter that stated "a return envelope has been

provided for your convenience in sending us back a copy of the purchase agreement

for the acreage as soon as it is available." Tr. 115. Ex. 13. David admitted that he

had not yet tendered proof of his part ownership of the Schooler Farm. Tr. 115-116.

However, this is a further indication that he had notified the trust that he was using

these withdrawn funds for the purchase of real estate. Tr. 115.

{¶26} On April 7, 2007, David sent a check to Philip for $67,500.00 that had

written on its memo line: "1/2 For moms Farm." Tr. 82. Ex. 1. This sum of money

constituted one-half of the $135,000.00 purchase price of the Schooler Farm. Tr. 119. On May 9, 2007, Philip sent an email to David that read: "David – your check arrived today 5/9/07, will hold it until further direction." Ex. 4. David then produced a bank statement that indicated that this check was cashed on May 15, 2007. Ex. 2. Philip admitted that his wife, Sandra Verhoff ("Sandra"), cashed this check and that he used these funds to purchase the Schooler Farm from the estate. Tr. 228.

{¶27} Based on this evidence, the jury found that David and Philip entered into a contract to purchase the Schooler Farm. Doc. 47. Prior to the sale of the Schooler Farm, Philip's email detailed the terms of the offer that was accepted for the purchase of this disputed property. In this email, Philip expressly characterized this as an offer from "David and Philip." Ex. 18. Further, the correspondence from Barbara and Mary Ann clearly indicates that the entire family was operating under the assumption that David and Philip were purchasing the Schooler Farm together. The check indicates that David paid consideration for his one-half share of the Schooler Farm and that Philip accepted this consideration by having this check cashed. Ex. 1. *See Rolland v. Biro*, 8th Dist. Cuyahoga No. 44632, 1982 WL 2547, *2, 6 (Nov. 18, 1982). David also produced evidence that he had paid all of the consideration that was due from him under the oral contract. The check that he sent to Philip for $67,500.00 represented half of the value of Schooler Farm's purchase price. Ex. 1.

-15-

**{¶28}** In this case the jury found that David carried the burden of establishing that an oral contract existed between David and Philip for the purchase of the Schooler Farm. Based on the evidence produced at trial, the jury could have reasonably found that David had carried the burden of establishing that a contract existed. Since this was an agreement for the purchase of real estate, we turn now to examining whether the doctrine of partial performance removes this oral contract from the statute of frauds. *See* R.C. 1335.05; *Spears, supra*, at ¶ 14.

**{¶29}** First, at trial, David identified a number of unequivocal acts that were performed in reliance on this oral agreement. *Spears, supra*, at ¶ 14. David produced evidence that he had paid all of the consideration that was due from him under the oral contract. At trial, David presented a copy of a check for $67,500.00 that was written to Philip. Ex. 1. Further, the memo line of this check read "1/2 For moms Farm," indicating that this payment was consideration for a one-half interest in the Schooler Farm. Further, this sum of $67,500.00 represented half the value of the $135,000.00 purchase price of the Schooler Farm. Ex. 1.

**{¶30}** As to possession, David testified that neither he nor Philip needed to ask permission from the other in order to enter onto the Schooler Farm property and that both of them freely visited the property at their convenience. Tr. 99. Further, David testified that, while he and Philip had keys to the property, none of his other siblings had keys to the Schooler Farm. Tr. 100. One of Philip and David's sisters

lived next to the Schooler Farm and was not given a key because Philip did not want her to have access to this property. Tr. 100.

{¶31} Further, the record indicates that David and Philip each performed tasks with the object of maintaining the property. David added Philip to a joint bank account on January 7, 2007. Ex. 9. At trial, David testified that the rental income from the Schooler Farm went into this joint account every month. Tr. 95. David would use the funds in this account to pay for the utilities on the property. Tr. 96. He testified that he paid for the property taxes on the Schooler Farm while Philip paid income taxes on the farm's revenues. Tr. 96. David stated that Philip was aware of these activities because he was a joint owner of his account and had full access to the account statements. Tr. 96. On cross-examination, Philip admitted that he has a mortgage on his house and that the bank, as the lender, has never paid his utility bills. Tr. 246.

{¶32} To substantiate these claims, David introduced a record of his transactions between 2009 and 2011 in which he paid the utilities and property taxes for the Schooler Farm. Ex. 21. *See Gleason v. Gleason*, 64 Ohio App.3d 667, 676, 582 N.E.2d 657, 663 (4th Dist. 1991) (holding that paying taxes and insurance on a farm property was some evidence of part performance.). This document also records deposits of rental income into this joint account. Ex. 21. The record further contains checks that Philip issued from the joint account that he had with David for various expenses, including insurance on the house at the Schooler Farm, annual

-17-

taxes on the property, and a mower used on the farm. Ex. 5. These checks had David and Philip's names on them. Ex. 5.

**{¶33}** Second, David presented evidence that demonstrated that these unequivocal acts were "exclusively referable to the agreement." *Spears, supra*, at ¶ 14. At trial, Philip and David each asserted a different theory regarding the significance of the $67,500.00 check that David mailed to Philip. At trial, Philip claimed that the $67,500.00 check was a loan from David that carried an interest rate of 1.4%. Tr. 207. David testified that he withdrew $50,000.00 of this amount from a trust account that was, at that time, producing returns of eight percent annually. Tr. 99. Thus, Philip asserts that David gave up an eight percent annual return to make a loan that carried an interest rate of 1.4%. *See* Tr. 99, 247.

**{¶34}** Further, Philip testified that he did not need this loan from David and had access to sufficient funds in 2007 to pay for the full purchase price of the Schooler Farm. Tr. 249. Philip said that David advanced him this loan because the attorney on the estate wanted the money immediately, and there was not time for Philip to sell these stocks. Tr. 249. According to Philip, however, these stocks would have only taken a "few days" to liquidate. Tr. 249. Since David mailed the check, Philip did not receive these funds until two days after David had issued the check. Ex. 1, 4. The bank records indicate that Philip did not have this check cashed until six days after he received this check. Ex. 7.

{¶35} This alleged loan also had no repayment schedule; no agreed upon method of receiving payments; and had a low interest rate that Philip seemed to have calculated without David's input. Tr. 242, 247. Philip testified that he repeatedly approached David with a check and offered to repay this alleged loan in full but claimed that David repeatedly refused to be paid. Tr. 248. However, after David requested a deed, Philip simply paid the balance of the alleged loan by depositing $61,000.00 into the joint account. Tr. 248.

{¶36} David, on the other hand, asserted that, prior to December 2015, this $67,500.00 had not been characterized as a loan and that he issued this check with the intention of purchasing a one-half interest in the Schooler Farm. Tr. 97-98. David also testified that he would not have paid for utilities and the property taxes if he did not have an agreement with his brother and did not believe that he had a one-half interest in the property. Tr. 96. David's actions are explained by the oral contract that was made for the joint purchase of the Schooler Farm. Philip's assertion—that the $67,500.00 check was a loan—does not make sense of David's or Philip's actions in between 2007 and 2015. Thus, these "unequivocal acts" are "exclusively referable to the agreement." *Spears, supra*, at ¶ 14.

{¶37} Third, David introduced evidence that he changed his position to his detriment in undertaking these actions. David testified that he withdrew $50,000.00 from a trust account in order to pay for the one-half of the Schooler Farm. Tr. 99. David stated that, at the time of this withdrawal, this trust account was producing

annual returns of eight percent. Tr. 99. At trial, Philip claimed that the $67,500.00 check was a loan from David that carried an interest rate of 1.4%. Tr. 207. Further, David paid for expenses associated with the Schooler Farm from in between 2007 and 2015. Through these actions, David "changed his position to his detriment" in reliance on the oral contract that he had with Philip. *Spears, supra,* at ¶ 14.

{¶38} Fourth, David presented evidence at trial that it would be "impractical to place the parties in statu [sic] quo" in the absence of enforcing this oral contract. *Spears, supra*, at ¶ 14. David had to forgo high returns in the trust account in order to invest this money in the purchase of the Schooler Farm. This investment came with certain expenses, such as utilities and property taxes. David shouldered these risks and responsibilities with the expectation that he would receive rental income from the operation of the farm and would own a one-half interest in the property. In the absence of enforcing this contract, David cannot return to the status quo ante.

{¶39} Further, not enforcing this oral contract would also result in an injustice as Philip would receive a windfall at David's expense. In arguing that this contract should not be enforced, Philip essentially asserts that the $75,000.00[1] sum in the joint bank account is sufficient compensation for the $67,500.00 that David sent to Philip. We find this argument to be unpersuasive for two reasons.

---

[1] On December 7, 2015, Philip deposited $61,000.00 into the joint bank account. Tr. 98, 207. Prior to this deposit, there was roughly $14,000.00 in rental income deposited into the joint account. Tr. 207. Thus, the total amount in the joint account was roughly $75,000.00. Tr. 207. Philip claimed that these funds were sufficient to repay the principal on the alleged loan from David in addition to a 1.4% interest rate over eight years. Tr. 207.

{¶40} First, the Schooler Farm appreciated in value significantly from $164,000.00 in 2007[2] to $311,377.00 in 2018. Tr. 144. In 2007, a one-half interest in the Schooler Farm was worth $67,500.00. In 2015, a one half-interest in the Schooler Farm was worth $155,688.50. Tr. 144. Doc. 50, 52. If this contract is not enforced, David paid $67,500.00 for a one-half interest in the Schooler Farm and would receive $75,000.00, a return of $7,500.00. Tr. 207, 224. Since Philip tendered $67,500.00 of his own money to the estate for a one-half interest in the Schooler Farm in 2007 and deposited $61,000.00 into the joint bank account to "repay" David's "loan" in 2015, Philip paid a total of $128,500.00 for the Schooler Farm. Since the Schooler Farm is worth $311,377.00, Philip would receive a return of roughly $182,877.00.[3]

{¶41} Second, Philip withheld roughly $32,000.00 from David in rental income from the property. Tr. 103. The $75,000.00 sum does not compensate David for his share of this withheld rental income. Instead, this withheld rental income increases the windfall Philip would receive if he were not held to the terms of the oral agreement that he entered into with his brother.

{¶42} Under the trial court's judgment entry, however, David received $171,688.50. This accounts for half of the withheld rental income and the value of

---

[2] While David and Philip paid $135,000.00 to the estate for the Schooler Farm, the property was appraised at $164,000.00. Tr. 119. The price of the Schooler Farm was discounted to account for the savings of having a private sale. The savings include not having to pay for a realtor. Tr. 91, 119.

[3] These calculations are limited to the value of a one-half interest in the Schooler Farm. The rental income is considered separately and is not factored into these calculations.

-21-

a one-half share of the Schooler Farm. Doc. 52. This is a far more equitable resolution of this dispute than what would result if this oral contract were not enforced. Under the trial court's judgment entry, each receives the value of one-half of the Schooler Farm at its appraised value of $311,377.00, and each receives one-half of the $32,000.00 of withheld rental income.

{¶43} After examining the evidence in the record, we conclude that the trial court, in these circumstances, did not err in finding that the doctrine of part performance applied and operated to remove this oral contract from the statute of frauds. Thus, the statute of frauds does not prevent this oral contract from being enforced. For this reason, the appellant's first assignment of error is overruled.

*Second Assignment of Error*

{¶44} In the event that this Court determines that an oral contract existed between David and Philip, the appellant argues that this action was commenced after the statute of limitations had run for oral contracts.

Legal Standard

{¶45} Under R.C. 2305.07, "an action upon a contract not in writing, express or implied, or upon a liability created by statute other than a forfeiture or penalty, shall be brought within six years after the cause thereof accrued." R.C. 2305.07. Generally, "a cause of action does not accrue until such time as the infringement of a right arises. It is at this point that the time within which a cause of action is to be commenced begins to run." *Oker v. Ameritech Corp.*, 89 Ohio St.3d 223, 224, 729

N.E.2d 1177, 1179 (2000), quoting *State ex rel. Teamsters Local Union 377 v. City of Youngstown*, 50 Ohio St.2d 200, 203-204, 364 N.E.2d 18, 20 (1977). For this reason, "[a] cause of action for breach of contract does not accrue until the complaining party suffers actual damages as a result of the alleged breach." *Kincaid v. Erie Ins. Co.*, 128 Ohio St.3d 322, 2010-Ohio-6036, 944 N.E.2d 207, ¶ 13, *modified on reconsideration on other grounds*, quoting *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.*, 42 Ohio App.3d 6, 536 N.E.2d 411 (9th Dist. 1988), paragraph one of the syllabus.

Legal Analysis

{¶46} Under the first assignment of error, we determined that the jury did not err in finding that an oral contract existed between Philip and David under which (1) Philip was obligated to deliver—at a later, unspecified date—a deed for a one-half interest in the Schooler Farm and (2) the parties were obligated to share the rental income. Tr. 92-93. On October 12, 2016, David filed a cause of action for breach of contract, alleging that Philip refused to deliver a deed to him and was withholding the rental income from the Schooler Farm. Doc. 1.

{¶47} The appellant argues that the statute of limitations began to accrue in 2007 because this is when David tendered the $67,500.00 check to pay for half of the Schooler Farm. Thus, the appellant argues that the applicable six-year statute of limitations for oral contracts had run by the time David raised this breach of contract claim. However, the fact that David, by entering into a contract and paying

consideration, obtained the right to ask Philip for a deed in 2007 does not mean that the statute of limitations began to run in 2007. The statute of limitations begins to accrue when the rights of a party to a contract are violated by a breach of the agreement, not when the rights of a party to a contract arise under an agreement. *Oker, supra*, at 224. Thus, the statute of limitations did not begin to run when David issued the $67,500.00 check to Philip in 2007.

{¶48} The appellant next argues that David's testimony at trial suggests that he may have asked for a deed earlier than 2015. Philip points to two statements that David made on cross-examination. First, David stated that he did not remember the first time that he asked Philip for a deed to half of the Schooler Farm. Tr. 130-131. Second, when asked whether he could possibly have been asked for a deed from Philip in 2007, David said, "It could have been. I don't recall." Tr. 130-131.

{¶49} While David stated that he could not recall whether he had asked for a deed prior to 2015, Philip testified that David had never asked him for a deed prior to 2015. Tr. 261. Thus, Philip's testimony undermines the argument that David may have requested a deed to a one-half interest in the Schooler Farm prior to 2015. Tr. 261. Further, Philip also stated that he began to withhold rental income from David in 2015.[4] Tr. 261. At trial, David testified that there were no disputes between him and Philip in between 2007 and 2015. Tr. 99. However, David

---

[4] Philip testified that he deposited all of the rental income into the joint account through 2014. Tr. 206. Thus, he stopped depositing rental income into the joint account in 2015. Tr. 261.

testified that, in 2015, he asked Philip for a deed that represented ownership of half of the Schooler Farm and that Philip refused this request. Tr. 97-98. David also testified that Philip began withholding the farm's rental income in 2015. Tr. 103.

{¶50} The testimony at trial established that, in 2015, Philip violated two of the obligations that he had under the agreement with his brother. Thus, the trial court did not err in determining that a cause of action for breach of contract arose in 2015 when Philip "refused to provide a deed for David's one-half interest and/or took other actions inconsistent with David's ownership of the property in 2015." Doc. 60. Further, since David filed a complaint against Philip in 2016, the trial court did not err in finding that the six-year statute of limitations had not yet expired at the time this action was commenced. Doc. 60. This cause of action is not barred by the applicable statute of limitations. For this reason, the appellant's second assignment of error is overruled.

### *Third Assignment of Error*

{¶51} The appellant argues that David's testimony at trial establishes that this alleged agreement was an illegal contract because David, as the executor of Martha's estate, was not permitted to buy property from Martha's estate.

### Legal Standard

{¶52} "An illegal contract is '[a] promise that is prohibited because the performance, formation, or object of the agreement is against the law.'" *Snyder v. Snyder*, 170 Ohio App.3d 26, 865 N.E.2d 944, ¶ 32 (11th Dist.), quoting Black's

Law Dictionary (8th Ed.Rev.2004) 345. "Where the performance of a contract violates a statute or act, public policy may prevent the enforcement of its obligations." *Countrymark Cooperative, Inc. v. Smith*, 124 Ohio App.3d 159, 164, 705 N.E.2d 738, 741 (3d Dist. 1997).

> **[I]llegality of contract is an affirmative defense. *McCabe/Marra Co. v. Dover * * ***, 100 Ohio App.3d 139, [147,] 652 N.E.2d 236 [(8th Dist. 1995)]; *Arthur Young & Co. v. Kelly * * ***, 88 Ohio App.3d 343, 623 N.E.2d 1303 [(10th Dist. 1993)]. When challenging a contract's enforceability based on illegality, one does not challenge the terms to the agreement; '[i]n short, asserting that defense does not contest the existence of an offer, acceptance, consideration, and/or a material breach of the terms of the contract.' *McCabe/Marra Co*., 100 Ohio App.3d at 148, 652 N.E.2d at 241.**

*Countrymark* at 164. "The burden of proving the contract's illegality is upon the party seeking to avoid the obligation." *Cantleberry v. Holbrook*, 5th Dist. Richland No. 12CA75, 2013-Ohio-2675, ¶ 21, quoting *Charles Melbourne & Sons, Inc. v. Jesset*, 110 Ohio App. 502, 505, 163 N.E.2d 773, 775 (8th Dist. 1960).

{¶53} In this case, the alleged illegality is a violation of R.C. 2109.44. This statute reads, in its relevant part, as follows:

> **(A) Fiduciaries shall not buy from or sell to themselves and shall not have in their individual capacities any dealings with the estate, except as expressly authorized by the instrument creating the trust and then only with the approval of the probate court in each instance. * * ***
>
> **(B) The fiduciary may petition the court for authority to purchase property of the estate if all of the following requirements are met:**
>
> **(1) Written consent to the purchase is signed by the following:**

**(a) Each known heir whose interest in the estate would be affected by the proposed purchase;**

**(b) Each known devisee whose interest in the estate would be affected by the proposed purchase.**

**(2) The written consents are filed with the court.**

**(3) The purchase is shown to be to the advantage of the estate.**

R.C. 2109.44(A, B). "The prohibition of the quoted statute is expressive of the common law, and any sale made contrary to the statutory exception is at least voidable." *Walters v. Wannemacher*, 6 Ohio App.2d 226, 230, 217 N.E.2d 695, 699 (3d Dist. 1964).

**Although not all authorities explicitly condemn purchases of trust property by a spouse or relative of the trustee, at least where it is apparent that no loss or prejudice results to the trust estate or where there are other circumstances, such as good faith and adequate consideration, justifying the court in upholding the transaction, the majority rule is that a purchase of trust property by a spouse *or close relative* of a trustee is improper and voidable by the beneficiary where and to the extent that such a purchase by the trustee himself would be improper and voidable by the cestui que trust, even though the transaction is free from actual fraud and supported by fair consideration. One reason for this rule is to prevent any conflict of interest in the mind of the trustee in a sale of the trust property, and to prevent any opportunity or temptation to him to take a profit or benefit from such a transaction.**

(Emphasis added.) *Magee v. Troutwine*, 166 Ohio St. 466, 470, 143 N.E.2d 581, 583 (1957), quoting 54 American Jurisprudence, 370, Section 466.[5]

---

[5] In *Magee*, the Supreme Court applied the majority rule as stated by 54 American Jurisprudence, 370, Section 466 in the context of spousal relationships. *Magee, supra*, at 584. While the Supreme Court has not applied this rule in a case where there was a private sale of estate assets to a close relative of the executor, the authority

**{¶54}** Under Ohio law, "a sale by a fiduciary to himself [or herself] is prohibited and void." *Magee*, at 583. However, the sale of estate assets by a fiduciary to a spouse or close relative is *not* void *ab initio*.[6] *Id*. at 582, citing 54 American Jurisprudence, 370, Section 466. *See Christman v. Christman*, 171 Ohio St. 152, 154, 168 N.E.2d 153, 155 (1960) (holding that the sale of estate assets to an executor's spouse is "not void."). Rather, the sale of estate assets to the executor's spouse or close relative at a private sale can potentially be "voidable at the election of the heirs."[7] *Id*., at 154, quoting *Magee* at 582. However, if the heirs

---

that it cited as the basis of its *Magee* decision held that private sales of estate assets to an executor's close relative and private sales of estate assets to an executor's spouse were both potentially voidable. *Id*. In this case, we rely on the majority rule quoted by *Magee*. *See Montgomery v. Mosley*, 4th Dist. Pike No. 448, 1990 WL 127047, *1 (Aug. 24, 1990) (interpreting *Magee* as standing for the proposition that a transfer of estate property by a fiduciary to a close relative is potentially voidable) *In Matter Nye*, 4th Dist. Pike No. 324, 1981 WL 6039 (Oct. 9, 1981). *See also Trust U/W of Woltering*, 1st Dist. Hamilton No. C-970913, 1999 WL 163759, *4 (March 26, 1999) (holding a "fiduciary may engage in self-dealing not only by directly purchasing such property, but also by facilitating the purchase of such property by another person or entity closely aligned with the fiduciary.") *Estate of Karder*, 5th Dist. Stark No. 2010CA00297, 2011-Ohio-3229, ¶ 25. *Compare In re Estate of Hughes*, 94 Ohio App.3d 551, 555, 641 N.E.2d 248, 250 (9th Dist. 1994) (holding the rule in "*Magee* is limited to situations in which a fiduciary sells estate property to a spouse and that the rule in *Magee* does not apply to transactions involving a fiduciary's close relative). Further, we do not find a reason to hold that the sale of estate property to a sibling of the executor is void while the Supreme Court has determined that a sale of estate property to the spouse of the executor is only voidable. *Magee, supra*, at the syllabus; *Christman, supra*, at paragraph one of the syllabus. The relationship between spouses is far closer than the relationship between siblings. Spouses are also much more likely to have more closely aligned interests than siblings. A sale of real property from the estate to the executor's spouse generally confers upon the executor, at the very least, a dower interest in that property. *See* R.C. 2103.02. The sale of estate property to the sibling of the executor does not necessarily transfer any interest in that property to the executor.

[6] In *Magee*, the Supreme Court did not expressly state that sales of estate assets to an executor's close relative were not void. *Magee, supra*, at syllabus. Rather, the Supreme Court held that sales in which the executor purchases assets directly from the estate were void and also held that private sales of estate assets to the executor's spouse or close relative were voidable. *Id*. at 583. Since private sales of estate assets to the executor's spouse or close relative were held to be voidable, we conclude, by inference, that these sales are not void ab initio. In *Christman*, the Supreme Court applied this logic in the context of spousal relationships, holding that *Magee* stood for the proposition that a private sale of estate property to the executor's spouse "was *voidable*, not void," even though *Magee* did not expressly state that sales to the executor's spouse were not void. *Christman, supra*, at 154.

[7] This rule has been applied by some courts in the context of a public sale. *Hartzler Mortgage Company v. Moyer,* 2d Dist. Champaign No. 78 CA 17, 1979 WL 208591, *4 (Mar. 19, 1979); *In re Estate of Kellhofer*, 4th Dist. Ross No. 943, 1983 WL 3125, *7 (Feb. 18, 1983); *Gahanna Bank Co. v. Miesse*, 41 Ohio App. 316,

unreasonably delay in bringing an action to challenge the sale of estate assets to the executor's close relative or spouse, the doctrine of laches may prevent the heirs from avoiding the contested contract of sale. *Christman* at paragraph two of the syllabus.

Legal Analysis

{¶55} Two agreements are at issue in this case: the agreement between Philip and the estate ("the sale contract") and the agreement between David and Philip ("the side-agreement"). Under the sale contract, Philip purchased the Schooler Farm from his mother's estate for $135,000.00. Subsequently, each of Martha's five children received roughly $27,000.00 from the proceeds of this sale. Under the side-agreement, David sent a $67,500.00 check to Philip for one-half the purchase price of the Schooler Farm. In exchange, Philip promised to purchase the Schooler Farm and deliver a deed for a one-half interest in that property to David at a later date. On appeal, the appellant only challenges the side-agreement, arguing it violates R.C. 2109.44 and is, therefore, an illegal contract that is void. The appellant does not challenge the sale contract.

{¶56} Two cases decided by the Supreme Court of Ohio govern our analysis of the issues raised herein. In *Magee v. Troutwine*, the Supreme Court applied R.C. 2109.44 to a situation in which an executor sold property from the estate to her

---

181 N.E. 31 (10th Dist. 1931). *See also Armstrong v. Hustoh's Heirs*, 8 Ohio 552 (1838). However, in the case before us, as in both *Magee* and *Christman*, the estate property was sold at a private sale. *Magee, supra*, at syllabus; *Christman, supra*, at 153. For this reason, we simply state this rule as applying to private sales and decline to enunciate a broader rule that covers both private and public sales.

spouse at a private sale. *Magee, supra*, at 582. The heirs contested this sale, arguing that this was a violation of R.C. 2109.44 and that the contract of sale was, therefore, void. *Id*. at 582. Even after noting that spouses share an extremely close relationship and generally have interests that are aligned, the Supreme Court found that this contract of sale was not void because the executor did not personally purchase the assets directly from the estate. *Id*. at 583.

{¶57} Instead, the Supreme Court held that the contract of sale under which estate assets were sold to the executor's spouse were "voidable at the election of the heirs." *Id*. at the syllabus. Thus, the Supreme Court drew a line between sales in which the executor personally purchases assets directly from the estate and sales in which the executor's spouse purchases assets from the estate. *Id*. at 583, 584. Since the heirs, in *Magee*, elected to avoid the sale of assets to the executor's spouse, these real estate purchases were set aside. *Id*. at 584.

{¶58} In *Christman v. Christman*, the Supreme Court considered the application of R.C. 2109.44 in a situation where the fiduciary was the executor of his father's estate and sold the family farm to his wife at a private sale. *Christman, supra*, at 153, 155. The executor and his wife subsequently moved onto the family farm. *Id*. at 155. The Supreme Court reaffirmed the rule in *Magee* and held that a contract of sale under which estate property is sold to the executor's spouse is not void but "*voidable* at the election of the heirs." (Emphasis sic.) *Id*. at 155, quoting *Magee, supra*, at the syllabus. Thus, the Supreme Court determined that the contract

of sale under which the family farm was sold to the executor's spouse was not void. *Id*. at 154.

{¶59} However, in *Christman*, the heirs of the estate waited over seventeen years to object to the sale of the family farm, even though they had been aware that the executor's spouse was purchasing this asset at the time of the sale. *Id*. at 153. The heirs had also observed improvements that the executor had made on the property and knew that he lived on the premises. *Id*. at 154-155. For this reason, the Supreme Court determined that the doctrine of laches prevented the heirs from electing to set aside the contract of sale under which the family farm was sold the executor's spouse. *Id*.

{¶60} The analyses in *Christman* and *Magee* contain two requirements that are relevant to the facts of the case before us. First, these analyses applied R.C. 2109.44 to the contract of sale in which property was sold directly from the estate. *Magee, supra*, at 584; *Christman, supra*, at 153. Second, the determination as to whether this contract of sale was void or voidable depended on the identity of the purchaser. Under these cases, if the executor is the direct purchaser of assets from the estate, the contract of sale between the executor and the estate is void. *Magee, supra,* at 583. If, on the other hand, the purchaser is the spouse or close relative of the executor, then the sale may be "voidable at the election of the heirs." *Magee, supra*, at syllabus; *Christman, supra*, at 154.

**{¶61}** In the case before us, the appellant challenge the side-agreement as being an illegal contract that is void. However, the Supreme Court has only applied the R.C. 2109.44 analysis to contracts of sale that are made with the estate. *Magee, supra*, at 584 (setting aside the *sale* of the real estate to the executor's spouse); *Christman, supra*, at 154. In this case, the side-agreement is not a contract of sale to which the estate is a party. No assets were sold directly from or transferred out of the estate pursuant to this side-agreement. Further, Philip purchased the Schooler Farm directly from the estate. Thus, in this case, the agreement that is relevant to the R.C. 2109.44 analysis was the sale contract between Philip and the estate, not the side-agreement between David and Philip. David, as the executor, was not a purchasing party under the sale contract through which the Schooler Farm was purchased directly from the estate.

**{¶62}** Contrary to the appellant's assertion, the side-agreement is not void because the Supreme Court has held only that a contract of sale between the executor and the estate is void under R.C. 2109.44. Thus, since David did not personally purchase the Schooler Farm directly from the estate, the trial court was correct in its determination that this side-agreement was not void. Doc. 60. However, the trial court then proceeded to determine whether the sale contract was voidable under *Christman*. Doc. 60. In its judgment entry, the trial court found that the doctrine of laches applied because Philip knew about the side-agreement at the time of the sale

of the Schooler Farm and "did not file to set aside the sale in a *timely* fashion." (Emphasis sic.) Doc. 60.

{¶63} However, the appellant's argument does not require us to examine whether the sale contract was voidable. Under *Christman* and *Magee*, when the executor's spouse purchased assets directly from the estate, the heirs could challenge the *contract of sale* in which the executor's spouse purchased assets directly from the estate. *Magee, supra*, at the syllabus; *Christman*, *supra*, at 154. If the heirs filed a timely objection to such a purchase, then the challenged *contract of sale* with the estate was voidable at the election of the heirs.[8] *Magee, supra*, at the syllabus; *Christman, supra*, at 154.

{¶64} On appeal and in his motion for a judgment notwithstanding the verdict, the appellant exclusively challenges the side-agreement. By arguing that only the side-agreement was void, the appellant was challenging the side-agreement by itself—on its own terms. However, in the absence of the sale contract, the side-agreement, on its face, is merely a contract between two brothers for the joint purchase of real estate. For this reason, the side-agreement, considered by itself, is not illegal and, as we have already determined, is not void.

---

[8] The requirement that the heirs timely file an exception to the contract of sale between the executor's spouse and the estate comes from *Christman* wherein the Supreme Court held that the doctrine of laches applied and prevented the heirs from challenging the contract of sale after seventeen years had passed. *Christman, supra*, at paragraph two of the syllabus. While no specific time requirement has been established, the heirs cannot unreasonably delay challenging potentially objectionable sales of estate assets. *Id.*

{¶65} The legality of the side-agreement is only questionable when it is considered together with the sale contract as one component of a larger arrangement. The appellant affirms this proposition when he argues, in his brief, that David used the side-agreement to establish a "strawman" purchase of the Schooler Farm. Appellant's Brief, 13. The side-agreement can only be a part of a "strawman" purchase if another agreement exists—in this case, the sale contract. On appeal, however, the appellant, in essence, argues that the "strawman" purchase violates R.C. 2109.44 but that only the side-agreement should be set aside. In other words, the appellant asserts that the entire arrangement is illegal but that only one-half of the illegal arrangement should be voided. We find this argument to be unpersuasive.

{¶66} In order to challenge this allegedly illegal arrangement, the appellant had to challenge the sale contract that made the side-agreement a component of a "strawman" purchase. Since both agreements are necessary to the "strawman" purchase, the appellant can only argue that the side-agreement is improper if he challenges the sale contract between Philip and the estate as voidable. Under the analysis in *Magee* and *Christman*, the sale contract is the agreement that falls within the purview of R.C. 2109.44. *Magee, supra*, at 582; *Christman, supra*, at 153. However, the appellant never challenged the sale contract as voidable.

{¶67} Further, as of this date, no heir has challenged the sale contract under which Philip purchased the Schooler Farm from the estate. Thus, the question as to whether this sale contract is voidable at the election of the heirs was not asked and

need not be answered. Philip only challenged the side-agreement, and that challenge failed. He testified at trial that he paid a fair price for the Schooler Farm; that he did not object to the sale of this property during the probate proceedings; and that he did not appeal any matter from the probate proceeding. Tr. 253. In this case, the trial court did not need to apply the doctrine of laches to prevent Philip from challenging the sale contract because Philip never challenged the sale contract.

{¶68} We also note that, if this arrangement was improper, Philip's actions are what enabled David to commit what the appellant allege to be a violation of R.C. 2109.44. This would be akin to the executor's husband in *Magee* challenging his wife's interests in the assets that he purchased from the estate as illegal and void, arguing that the executor—his wife—used *him* to work around the requirements of R.C. 2109.44 while simultaneously arguing that this sale to *him* should not be set aside. However, in *Magee*, the contract of sale between the spouse and the estate was voidable with any agreements between the executor and her husband notwithstanding.

{¶69} The fact that Philip does not challenge the sale contract indicates that he believes that the estate did not suffer any prejudice. If Philip paid a fair price for the Schooler Farm, then David, as executor, did not act in a manner that was detrimental to the estate or its heirs. In asserting that the side-agreement alone should be set aside, the appellant suggest that David's activities as fiduciary did not ultimately prejudice the heirs.

{¶70} Further, not only did Philip know about the side-agreement in 2007, but he testified that the other heirs were aware that he (Philip) was purchasing the Schooler Farm directly from the estate. Philip Deposition Tr. 15. David also presented evidence, in the form of letters and emails that his three sisters were aware that he was seeking to obtain an interest in the Schooler Farm property through a side-agreement. Ex. 3A, 3B, 3C, 3D, 3E, 18. The record does not contain any evidence that any of the heirs objected to the sale contract even though each of them had knowledge of its terms. Tr. 253. There is also some evidence in the record that four of the five siblings wanted to keep the Schooler Farm in the family and that this was in line with the wishes of the decedent. Tr. 80. Ex. 3C.[9]

{¶71} In this case, the appellant asserted that David engaged in a "strawman" purchase of the Schooler Farm. Appellant's Brief, 13. This purchase was composed of two parts: the side-agreement and the sale contract. The appellant only challenged one of these two agreements as illegal, arguing that the side-agreement was void. This argument failed as David did not personally purchase assets directly from the estate through this side-agreement. In order to challenge the "strawman" purchase, the appellant had to challenge the sale contract as voidable. However, the appellant chose not to do this and, in so doing, chose not to challenge the

---

[9] In *Montgomery v. Mosley*, the Fourth District found that the case *In Re Minch's Will*, 71 N.E.2d 144 (8th Dist. 1932) stood for the proposition that "a close family conveyance is not self dealing per se but depends on the circumstances * * *." *Montgomery, supra*, at *1. However, since we have determined that Philip did not challenge the sale contract as voidable, we do not need to determine the impact of the sibling relationship and the family context of this transaction on this case.

"strawman" purchase. For these reasons, we conclude that the appellant has not carried the burden of establishing the affirmative defense of illegality of contract. Thus, the appellant's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶72}** In this assignment of error, the appellant argues that the trial court erred by denying his motion for a judgment notwithstanding the verdict.

Legal Standard

**{¶73}** "The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict." *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334, 338 (1976). The standard for granting a motion for a directed verdict—and, therefore, a motion for a judgment notwithstanding the verdict—is set forth in Civ.R. 50(A)(4), which reads as follows:

> **When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.**

Civ.R. 50(A)(4). However, "if reasonable minds might reach different conclusions based on some competent evidence favoring the nonmoving side, the motion must be denied." *Kubiak v. Wal-Mart Stores, Inc.*, 132 Ohio App.3d 436, 440, 725 N.E.2d 334, 336 (3d Dist.). "The 'reasonable minds' test mandated by Civ.R.

50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 3.

{¶74} While the same standard applies on appeal to a motion for a directed verdict and a motion for a judgment notwithstanding the verdict, these two kinds of motions "are not evaluated identically." *Ley v. Procter & Gamble Co.*, 3d Dist. Allen No. 1-09-41, 2010-Ohio-834, ¶ 23.

> **When a court rules on a motion for JNOV, all of the evidence introduced at trial is available for the trial court's consideration. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 504 N.E.2d 19. With a motion for a directed verdict, only the evidence presented during the plaintiff's case-in-chief is evaluated by the reviewing court. *Chemical Bank of New York v. Neman* (1990), 52 Ohio St.3d 204, 206-07, 556 N.E.2d 490. The appellate court reviews the trial court's decision on both motions de novo. *See Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 509 N.E.2d 399.**

*Ley* at ¶ 23.

{¶75} "A motion for directed verdict or a motion for judgment notwithstanding the verdict does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence." *O'Day v. Webb*, 29 Ohio St.2d 215, 280 N.E.2d 896 (1972), paragraph three of the syllabus. In considering a motion for judgment notwithstanding the verdict, a court does not weigh the evidence or test the credibility of the witnesses. *Osler v. City of Lorain*, 28 Ohio St.3d 345, 504 N.E.2d 19 (1986), at syllabus.

"Since we are presented with a question of law, we apply a de novo standard of review." *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 14.

Legal Analysis

**{¶76}** In this assignment of error, the appellant advances four arguments against the trial court's decision to deny his motion for a judgment notwithstanding the verdict. We will consider each of these arguments in turn. First, the appellant argues that the trial court erred in finding that the doctrine of laches prevented Philip from contesting the sale of the Schooler Farm but did not apply to David, who did not request a deed from Philip for eight years after the oral contract was formed. However,

> **[i]n order to invoke the doctrine of laches, the following * * * must be established: 'Delay in asserting a right does not of itself constitute laches, and in order to successfully invoke the equitable doctrine of laches it must be shown that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting his claim.'**

*Connin v. Bailey*, 15 Ohio St.3d 34, 35-36, 472 N.E.2d 328 (1984), *Smith v. Smith*, 168 Ohio St. 447, 156 N.E.2d 113 (1959), at paragraph three of the syllabus. In this case, the trial court determined that the doctrine of laches prevented Martha's heirs from electing to avoid the sale of the Schooler Farm.

**{¶77}** However, our prior analysis renders the issue of whether the doctrine of laches prevents Philip from seeking to avoid the side-agreement moot. In the

third assignment of error, we determined that Philip never challenged the sale contract under which he purchased the Schooler Farm from the estate. Thus, the issue of whether the sale contract was voidable was not raised and did not, therefore, need to be addressed. In this case, the trial court's application of the doctrine of laches is tied to the issue of whether the sale contract is voidable. Since none of Martha's heirs challenged the sale contract as voidable, the trial court did not need to apply the doctrine of laches to prevent Martha's heirs from avoiding the sale contract.

**{¶78}** We turn now to whether the doctrine of laches should operate to prevent David from asserting his right to a one-half interest in the Schooler Farm. The fact that David delayed in requesting a deed from Philip does not, by itself, mean that the doctrine of laches is herein applicable because David's delay does not appear, from the evidence in the record, to have caused Philip any material prejudice. *See Connin, supra*, at 35-36. In 2007, Philip owed David a deed for a one-half interest in the Schooler Far. In 2015, Philip owed David a deed for a one-half interest in the Schooler Farm. Thus, his obligation under the side-agreement remained the same. Further, in between 2007 and 2015, David paid for the property taxes and utilities for the Schooler Farm, giving Philip the benefit of reducing the costs of operating the Schooler Farm for eight years. Since Philip has not shown how this delay has caused him material prejudice, we conclude that the doctrine of

laches does not prevent David from asserting his rights rights under the side-agreement that he had with his brother.

**{¶79}** Second, the appellant argues that the trial court "refused to recognize the applicability of R.C. 2109.44," which prohibits an executor, as fiduciary, from purchasing property directly from the estate. Appellant's Brief, 14. The trial court, in its judgment entry, stated the following about the applicability of R.C. 2109.44:

> **The defendants correctly assert that R.C. 2109.44 prohibits self-dealing by a fiduciary, such as David was in his capacity as an executor. All parties agree that Philip purchased the estate solely in his name. Thus, David did not buy the farm directly.**

Doc. 60. The trial court found that the side-agreement between David and Philip did not violate the express language of R.C. 2109.44.

**{¶80}** We conclude that the trial court did not err in making this decision. As our prior analysis has already determined, contracts of sale with the estate fall within the purview of R.C. 2109.44 under *Magee* and *Christman*. Thus, R.C. 2109.44 applies to the sale contract between Philip and the estate but does not apply directly to the side-agreement. However, the appellant chose not to challenge the sale contract between Philip and the estate, which is the contract that comes within the purview of R.C. 2109.44. Thus, this argument is without merit.

**{¶81}** Third, the appellant argues that the trial court erroneously relied upon the Supreme Court of Ohio's decision in *Christman, supra*. Doc. 60. The appellant asserts that *Christman* is not applicable because he was not seeking to set aside a

completed sale. Instead, the appellant was challenging a sale that was barred by statute and that should be seen as having "not taken place." Appellant's Brief, 14. On appeal, the appellant essentially argues that *Christman* does not apply because the contract between David and Philip was void, or, in the words of his brief, this "sale" had "not taken place." Appellant's Brief, 14.

{¶82} However, the rule in *Christman* determines whether the sale of an estate asset is void or voidable under R.C. 2109.44. *Christman* at 153. Thus, in the context of the case before us, the appellant cannot claim that the sale of an estate asset is void under R.C. 2109.44 without reference to *Christman* because *Christman* is the case that defines which sales of estate assets are void under that statutory provision. After reviewing the relevant case law, we conclude that the trial court did not err in relying upon the holding in *Christman*.

{¶83} Fourth, the appellant notes that the trial court stated that the statute of limitations for written contracts was eight years. However, the statute of limitations for written contracts was not eight years until after 2012. R.C. 2305.06. Prior to 2012, the statute of limitations for written contracts was fifteen years. *See* R.C. 2305.06. Since this contract was formed in 2007, the appellant argues that the trial court's analysis listed an incorrect statute of limitations for written contracts. In its judgment entry, the trial court stated:

> **The Revised Code provides an eight-year statute of limitations for filing a cause of action based upon a written contract, R.C. 2305.06, and a six-year statute of limitations period for oral**

**contracts, R.C. 2305.07.  Construing the evidence in favor of the plaintiff, the cause of action for breach of the contract would not have occurred until Philip refused to provide a deed for David's one-half interest and/or took other actions inconsistent with David's ownership of the property in 2015.  This action was commenced on October 12, 2016, well within either the eight-year or six-years [sic] limitations period.**

Doc. 60.

{¶84} Since David filed a cause of action within the shorter timeframe of six years that is required for oral contracts, the length of the statute of limitations for written contracts is immaterial to the disposition of this case.  Thus, if the trial court erred by listing the statute of limitations for written contracts as eight years instead of fifteen years, this was clearly harmless error.  *See Knapp v. Defiance Therapeutic Massage & Wellness Center*, LLC, 2018-Ohio-1890, 112 N.E.3d 361 (3d Dist.), citing Civ.R. 61.  Further, the appellant has not demonstrated any prejudice by this alleged misstatement of the law.  *Id*.

{¶85} After reviewing the evidence in the record, we conclude that the arguments that the appellant has raised in this assignment of error are without merit.  Further, we find that the verdict is supported by sufficient evidence.  Thus, the trial court did not err in denying the appellant's motion for a judgment notwithstanding the verdict.  For these reasons, the appellant's fourth assignment of error is overruled.

*Fifth Assignment of Error*

**{¶86}** The appellant argues that the jury verdict was against the manifest weight of the evidence because there was no evidence presented to establish that an enforceable contract existed.

Legal Standard

**{¶87}** "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

> **'[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct.'** *State v. Wilson*, **113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, citing** *Seasons Coal Co. v. Cleveland* **(1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflection, and gestures.** *Seasons Coal Co*. **at 80, 10 OBR 408, 461 N.E.2d 1273. 'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.[']**

*Warnecke v. Chaney*, 194 Ohio App.3d 459, 2011-Ohio-3007, 956 N.E.2d 908 (3d Dist.).

Legal Analysis

**{¶88}** We reincorporate the evidence presented in previous assignments of error and turn now to examining the evidence presented by the Defense at trial.

During his testimony, Philip denied entering into the side-agreement with David for the joint purchase of the Schooler Farm. Tr. 170-171, 177. He claimed that he did not want to buy this property with David and was surprised when he received a $67,500.00 check in the mail from David. Tr. 177.

{¶89} At trial, Philip testified that the $67,500.00 check from David was a loan. Tr. 74. He claimed that he called David to inquire about the check. Tr. 225. David told him that he was loaning this money to Philip because David needed the purchase of the Schooler Farm to go through as soon as possible in order to probate the estate. Deposition Tr. 15. Philip testified that he put the phone on speaker so that his wife, Sandra, could hear David state that the check was, in fact, a loan. Tr. 225, 228. At trial, Sandra testified that she heard David say over the speakerphone that the $67,500.00 check was a loan. Tr. 266-267. However, Philip admitted that he had no other evidence of this conversation and that this arrangement was never referred to as a loan in his email correspondence with David. Tr. 226. He further admitted that he does not have any other written records that refer to this $67,500.00 check as a loan. Tr. 244.

{¶90} During cross-examination, David's attorney referenced Philip's deposition wherein he stated that there was no agreed upon interest rate or repayment schedule for this loan. Tr. 247. Deposition Tr. 24. Philip also did not present any loan statements sent to or from his brother and did not have any evidence at trial that the $75,000.00 figure was the product of an actual amortization

calculation at a 1.4% interest rate. Tr. 259. He also stated that David refused his repeated attempts to repay the loan, though Philip has no documentation of these offers. Tr. 248-249. Deposition Tr. 24-25.

{¶91} However, in 2015, Philip stated that he simply deposited $61,000.00 into the joint bank account to repay the principal on the loan from David. Tr. 206. Philip also testified that he deposited all of the rental income into the joint account in between 2008 and 2014 as payments on that loan because this is what David requested as the method of repayment. Tr. 206, 243. He said that he stopped depositing rental income into the account in December of 2015 because the loan had been paid off by that time. Tr. 211.

{¶92} To support his argument that he was the sole owner of the Schooler Farm, Philip pointed to the fact that he was listed as the owner of the Schooler Farm on the deed; signed the farm lease as the landlord; was listed as the insured on the relevant policies; and claimed the income from the property on his taxes. Tr. 184, 204, 208, 210. He stated that David did not sign the lease or request a copy of the lease for his records. Tr. 204.

{¶93} At trial, Philip acknowledged that he was aware that David was paying the property taxes on the Schooler Farm but claimed that he did not like that David was making these payments. Deposition Tr. 46. He admitted that the property tax bill was sent to David and was in David's name. Tr. 241-242. Philip said that had the name on the property tax bill changed to his name in 2013. Tr. 242. In 2011,

David filed a current agricultural use valuation renewal application at the Allen County Auditor's office. Tr. 238-240. At trial, Philip claimed that David was not authorized to sign this document and forged his (Philip's) signature. Tr. 237, 240, 241. Ex. 24. At trial, Philip claimed that David's actions with regard to the property tax bill amounted to identity theft, though Philip had never raised a claim against David for identity theft or forgery. Tr. 237, 242.

{¶94} Further, he testified that he took care of the maintenance of the Schooler Farm and that David did not contribute to the upkeep of the property. Tr. 217. During his deposition, Philip stated that he the cost of maintaining the property was $32,811. Deposition Tr. 47. He further insisted that the value of the labor he put into this property was $97,389.00. *Id.* These maintenance costs included purchases, such as a go-cart and a gas grill. *Id.* at 50. He stated that this go-cart was for his children for "fun." *Id.*

{¶95} However, family members, including Philip and his wife, were the only people who performed the labor on the property that was alleged to have been worth $97,389.00. *Id.* In reaching this figure, Philip estimated the total hours of work that were performed and assigned each hour a value of $55.00. *Id.* When asked where he obtained the hourly figure, he claimed that this was a standard rate for businesses to charge for this type of work, though he could not list the names of any businesses he contacted to obtain this number. *Id.* He also could not state the number of businesses he had contacted to gather this information. *Id.* at 51. Further,

there were no time cards or receipts submitted to substantiate these claims. *Id*. at 47, 49. Philip stated that he never billed his brother for all of this work because he believed that he was the sole owner of the property. Tr. 218.

{¶96} In his deposition and at trial, Philip denied seeing the email from Barbara to David and the message from Mary Ann to David. Deposition Tr. 19. Tr. 230. However, his email address was listed as one of the recipients of this message. Tr. 230. During cross-examination, Philip confirmed that his email address was correct on the copy of the email between David, himself, and Barbara, but he again denied receiving the email. Tr. 231.

{¶97} At trial, David testified the $67,500.00 check was to purchase a one-half interest in the Schooler Farm. Philip, on the other hand, testified that this $67,500.00 check was a loan. The jurors, as the finders of fact, apparently determined that the evidence presented by David was more credible. *See Seasons Coal Co., Inc., supra,* at 81. After considering the evidence in the record on the basis of its weight and credibility, we conclude that the jury's verdict in this case was based upon some competent, credible evidence. Further, we do not find any indication in the record that the jurors lost their way and returned a verdict against the manifest weight of the evidence. For these reasons, the appellant's fifth assignment of error is overruled.

*Conclusion*

**{¶98}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Allen County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/hls**