[Cite as *Canter v. Garvin*, 2021-Ohio-99.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

CLAY CANTER,

    PLAINTIFF-APPELLEE,                CASE NO. 14-19-30

    v.

JOHN ROGER GARVIN ET AL.,           O P I N I O N

    DEFENDANTS-APPELLANTS.

Appeal from Union County Common Pleas Court
Trial Court No. 2016-CV-0169

**Judgment Reversed and Cause Remanded**

**Date of Decision: January 19, 2021**

APPEARANCES:

    *Thomas H. Fusonie and Daniel E. Shuey* **for Appellants**

    *Terrence G. Stolly and Zebulon N. Wagner* **for Appellee**

Case No. 14-19-30

**PRESTON, J.**

{¶1} Defendants-appellants, John Roger Garvin ("John") and Anita Marie Green ("Green") (collectively the "Co-Trustees"), as co-trustees of the John L. Garvin Trust (the "Trust"), appeal the October 24, 2019 judgment of the Union County Court of Common Pleas overruling their objections to a March 19, 2018 magistrate's decision, in which the magistrate ordered that an alleged contract involving the sale of land be specifically performed and that the Co-Trustees convey approximately 100 acres of farmland in West Mansfield, Ohio to plaintiff-appellee, Clay Canter ("Canter"). For the reasons that follow, we reverse.

{¶2} At the heart of this case is a single question: did Canter and John L. Garvin ("Garvin"), the Co-Trustees' father and predecessor trustee, enter into a legally enforceable contract whereby Canter either purchased approximately 100 acres of Garvin's 108-acre farm in West Mansfield, Ohio (the "Farm") from the Trust,[1] with possession transferring after Garvin's death, or acquired the right to purchase these 100 acres for $200,000 upon Garvin's demise? While this question may be straightforward, the facts of this case are anything but.

---

[1] If Canter did contract with Garvin to purchase part of the Farm, title would be transferred to him from the trustee of the Trust, as holder of legal title to the Farm, rather than from the Trust itself as an independent legal entity. So, when we refer to Canter agreeing to buy part of the Farm from the Trust, or to other transactions involving Canter and the Trust, we realize that these are less than completely accurate descriptions of the transactions described. However, for ease of reading and where appropriate, we will continue to describe these transactions as being between Canter and the Trust rather than as being between Canter and the trustee of the Trust.

-2-

{¶3} Canter first met Garvin in 1986 when Canter approached Garvin to ask for permission to fish at the Farm. At the time, Garvin was in his early 70s. According to Canter, in the years that followed, he and Garvin developed a close friendship. Canter and his wife, Vicky Canter ("Vicky"), would socialize with Garvin and his wife, Ruth Garvin ("Ruth"), and the couples would occasionally go out to dinner together. In addition, Canter and Garvin would attend auctions together, and Canter would help maintain Garvin's farm equipment.

{¶4} In 2003, Canter and Garvin entered into a verbal agreement by which Canter rented a portion of the Farm, consisting of a pasture, a lane, and a barnyard, to raise cattle. The agreement called for Canter to pay Garvin $6 per head of cattle; Garvin was to be responsible for caring for the fences surrounding the rented farmland. In December 2006, Canter began renting a barn from Garvin in addition to the pastureland.

{¶5} According to Canter, sometime in 2008, he and Garvin were spraying bushes along one of the property lines of the Farm when Garvin asked him whether he would be interested in buying the Farm. Canter indicated that he would be interested in buying the Farm for $200,000. Garvin, apparently satisfied with this figure, told Canter that he would think about it. However, Canter and Garvin did not reach an agreement in 2008 regarding the sale of the Farm, and the matter was seemingly abandoned.

{¶6} By 2009, Canter was frequenting the Farm to care for his livestock and to check in on Garvin, who was by then approximately 95 years old. According to Canter, it was during one of these visits, in April 2009, that Garvin asked him whether he was still interested in buying the Farm for $200,000. Canter confirmed that he was still interested. Garvin then handed Canter a piece of white paper and asked Canter to read what was written on the paper. Although Canter requires reading glasses, he was able to make out some of the print on the paper, which Canter insisted was typewritten. According to Canter, the paper stated, "John Garvin, Trustee, gives Clay Canter the right to purchase my farm at $200,000," and it "said at time of death, [Canter] would receive the property." (July 13, 2017 Tr., Vol. I, at 42, 97). Canter recalled that the document "said a hundred acres. Approximately, one hundred acres." (*Id.* at 42). Canter also recalled that there was letterhead in the top left corner of the paper, that the bottom right corner of the paper appeared to contain a notary stamp, and that Garvin's signature was affixed to the bottom of the paper. Furthermore, Canter claimed that the top of the paper said "John Garvin Trust" and that, underneath these words, it said "John L. Garvin, Trustee." (*Id.*). Canter claimed that only then did he realize that the Farm was in the Trust.

{¶7} At that point, Canter informed Garvin that he could not read any more without his reading glasses. Rather than allowing Canter to retrieve his reading

glasses from his vehicle, Garvin took the paper from Canter and began reading it aloud. According to Canter,

> [Garvin] read [him] the paperwork and read that it gave [him] the right to purchase [the Farm] and [Garvin] went on through about the borders of the property and the acreage. And * * * it mentioned two red posts. Two posts that weren't in yet that would be painted red and drove as boundaries to the property and [Garvin] said one of them deeded the fencerow on State Route 47. [Garvin] said north of a white fence that was a yard fence on his property. The second post would be east of the first fence post and that the property line would go to the fence, across the creek to the fence but it went over to another corner of the property and [Garvin] would carve out the house and the buildings.

(*Id.* at 43). Canter remembered that after Garvin was done reading the paper,

> [Garvin] * * * went on about the creeks that he wanted straightened out that had erosion. He had large thorn trees both on the property that [Canter] was leasing and outside the property [Canter] was leasing down the lane and in the woods behind the property that [Canter] was leasing that he wanted the trees and thorns removed.

And, also, on the side that [Jerry] Regula [("Regula")] was leasing

that he also mentioned that he wanted those trees removed.

(*Id.* at 45). Canter stated that he and Garvin agreed that the performance of this work "would be part of * * * the terms on the Farm" and that he "would not receive cash" for doing the work. (*Id.*). According to Canter, he and Garvin "shook hands on it as the agreement and [he] * * * thanked [Garvin] for giving [him] the opportunity to purchase the Farm." (*Id.*).

{¶8} According to Canter, after he and Garvin entered into the agreement, Garvin retained the piece of paper containing the terms of the agreement. Canter did not sign the piece of paper, and he never asked for or possessed a copy of the document. In the months and years following Canter and Garvin's alleged agreement, several people saw documents that may have been the document Canter and Garvin reviewed in April 2009, though descriptions of these documents vary. Ruth, who was present when Garvin read to Canter from the paper, said that she once saw a document that said that Garvin was giving Canter the right to purchase part of the Farm upon Garvin's death. However, she stated that the paper used to compose this document was part of a sheet of yellow tablet paper, that the inscriptions were handwritten in pencil, and that the document was not notarized.

{¶9} Likewise, Kathy Taylor ("Taylor"), Ruth's friend, recalled that during one visit to Garvin's house, she saw a piece of yellow paper with four inches of

handwriting stating that Canter was going to be given the right to purchase the Farm. Jesse Canter ("Jesse"), Canter's son, remembered that, two to three years after Canter and Garvin allegedly entered into their agreement, he saw a document that was much like the one Canter described. Jesse stated that the document, which he saw inside of Garvin's house, was typewritten on white paper, featured a notary seal, and signed by Garvin. Jesse said that the document mentioned a trust and that Canter had permission to buy part of the Farm for $200,000. Finally, Green testified that although she could not remember precisely when it happened, Garvin once came to her house, handed her a "four-by-six piece of paper," and "just told [her] to keep it." (July 13, 2017 Tr., Vol. II, at 174, 176). She stated that the paper was orange and that she recognized the writing on the paper as Garvin's handwriting and Garvin's signature. However, other than a brief glance after she unfolded the paper, Green did not read it, and she could not recall any of its contents. After Garvin gave Green the paper, she put it in a desk drawer in her computer room along with other loose papers.

{¶10} Shortly after Canter and Garvin allegedly entered into the contract, Canter began performing work at the Farm. Canter paid to have his uncle's excavator transported to the Farm, and for two weeks, Canter's uncle, Eric Canter ("Eric"), worked 10-12 hours per day clearing brush, tearing down thorn trees, and rerouting and improving a creek on the Farm. Although the work performed by Eric

was originally done in exchange for work Canter had earlier completed for Eric, Canter paid Eric an additional $1000 for the work he performed at the Farm. After Eric had finished working, Eric's excavator was left at the Farm for four more weeks, and Canter used Eric's excavator to complete additional work. According to Canter, after this initial six-week period, he worked at the Farm for a "[y]ear-and-a-half to two years" with his own equipment, and he would work "until after dark most every night" and on the weekends. (July 13, 2017 Tr., Vol. I, at 50). By the end of this period, Canter had removed many of the thorn trees at the Farm, cleared away brush, rebuilt creek banks, redirected the creek, replaced some fencing, leveled ground, and planted grass seed. Canter maintained that he was "paid nothing" by Garvin for this work. (*Id.* at 64).

{¶11} Sometime after Canter and Garvin allegedly entered into the contract, two metal fence posts were placed in the ground at the Farm and painted red. One of the fence posts was placed along a fencerow on the westernmost boundary of the Farm. The other post was placed near a small outbuilding east of the first post. According to Canter, Garvin stated that he had driven the posts to mark the boundaries of the property that was the subject of their agreement. Other people were aware of the fence posts and their apparent significance. Ruth recalled that Garvin had told her that the fence posts split the Farm into two parts and demarcated the land that was the subject of the alleged agreement; she thought that Garvin "had

in mind that [Canter] would buy the north portion." (*Id.* at 131). Jesse remembered that Garvin had told him that he placed the painted fence posts in the ground to mark the boundaries of the property for which Canter had allegedly contracted. Vicky stated that she was with Canter when Garvin told Canter that the posts had been placed and that they marked the boundaries of the property that was the subject of the alleged agreement. Furthermore, Garvin's step-grandson, Christian Fogle, recalled that Garvin had pointed out the fence posts to him and indicated that they marked the boundaries of the property that Canter aimed to purchase.

{¶12} Following their alleged April 2009 agreement, Canter and Garvin's relationship remained much the same. Canter continued to perform under the terms of his verbal lease agreement with Garvin. Canter continuously raised cattle at the Farm from 2003 until approximately 2017, other than an 11-month period between December 2014 and November 2015, and he maintained his friendship with Garvin. Canter and Garvin's relationship continued in this fashion until Garvin fell and broke his hip in December 2015. Canter visited with Garvin often over the next two months until Garvin died in February 2016 at the age of 102.

{¶13} After Garvin's death, no document evidencing Canter and Garvin's alleged contract could be found. According to John, Garvin was a meticulous record-keeper, and his records were in good order when he died. When Garvin's records were searched after his death, John easily found Garvin's estate planning,

financial, and business documents. However, according to the Co-Trustees, the search of Garvin's records did not uncover any document suggesting that Garvin had sold part of the Farm to Canter or given Canter the right to buy part of the Farm. Furthermore, Green was unable to locate the piece of paper that Garvin had earlier given to her for safekeeping. She said that she did not deliberately destroy the paper, and she could not remember throwing it away.

{¶14} It is unclear from the record exactly when or how Canter attempted to take possession of part of the Farm or to exercise his alleged right to purchase a portion of the Farm from the Trust. Evidently, Canter attempted to purchase a portion of the Farm from the Trust at some point after Garvin's death but the Co-Trustees declined to deal with him.

{¶15} On August 19, 2016, Canter filed a complaint against the Co-Trustees. (Doc. No. 2). In his complaint, Canter asserted various causes of action, including breach of contract, "breach [of] oral contract," and promissory estoppel. (*Id.*). Canter requested that the Co-Trustees "be ordered to sell the Farm, less the acreage upon which the farmhouse is situated," to him for $200,000, along with "monetary judgment against [the Co-Trustees] in the amount proven for breach of contract" and other legal and equitable relief. (*Id.*).

{¶16} On September 12, 2016, the Co-Trustees filed their answer to Canter's complaint. (Doc. No. 9). In their answer, the Co-Trustees asserted that because

Canter could not produce the written document evidencing the alleged agreement between him and Garvin, his claims were barred by the statute of frauds. (*See id.*). In addition, the Co-Trustees filed counterclaims against Canter. (*Id.*). They requested that Canter be evicted from the portion of the Farm that he rented, and they requested an award of damages for unpaid utility costs and for the costs of "repairs and other damages caused by the waste [Canter] committed or allowed to occur upon the leased premises." (*Id.*). On September 21, 2016, Canter filed his answer to the Co-Trustees' counterclaims. (Doc. No. 10).

{¶17} On July 13, 2017, a bench trial commenced before the magistrate. (*See* Doc. No. 40); (July 13, 2017 Tr., Vol. I, at 1, 5). Eventually, on March 19, 2018, the magistrate issued his decision and recommendation. (Doc. No. 61). The magistrate recommended that the trial court find that Canter and Garvin "entered into a contract for the sale of certain real estate" and that irrespective of compliance with the statute of frauds, because Canter performed extensive work at the Farm, "the doctrine of part performance takes the transaction out of the statute of frauds." (*Id.*). The magistrate further recommended that the trial court find that "the real estate to be sold consists of all acreage north of a line demarcated by two red posts which line extends from the western most boundary of [the Farm] and extending to the eastern most boundary of [the Farm]," that "all acreage south of the above bifurcating line is not subject to the sale contract," and that "the purchase price is

-11-

$200,000." (*Id.*). Accordingly, the magistrate recommended that the trial court order that "the contract for the sale of real estate between [Garvin] and [Canter] be specifically enforced" and that the property be conveyed to Canter for $200,000. (*Id.*).

{¶18} On April 11, 2018, the Co-Trustees filed their objections to the magistrate's decision. (Doc. No. 65). On April 23, 2018, Canter filed his response to the Co-Trustees' objections to the magistrate's decision. (Doc. No. 66). On April 30, 2018, the Co-Trustees filed their reply brief in support of their objections to the magistrate's decision. (Doc. No. 67).

{¶19} On October 24, 2019, the trial court issued a judgment entry overruling most of the Co-Trustees' objections to the magistrate's decision. (Doc. No. 72). In particular, the trial court concluded that the writing Canter and Garvin reviewed in April 2009 contained all of the essential terms of their alleged agreement and that, alternatively, the doctrine of part performance applied to remove the alleged agreement from the operation of the statute of frauds. (*Id.*). However, the trial court sustained one of the Co-Trustees' objections, which related to the description of the property to be sold to Canter pursuant to his alleged agreement with Garvin. (*Id.*). As a result, the trial court ordered that, contrary to the magistrate's finding, the "acreage to be sold shall be all acreage north of a line demarcated by two red posts which line extends from the western most boundary of [the Farm] and extending to

the eastern most boundary of [the Farm] and the field to the east of the house, leaving approximately eight acres with the house and garage." (*Id.*). Furthermore, the trial court denied the Co-Trustees' counterclaims. (*Id.*).

{¶20} On November 22, 2019, the Co-Trustees filed a notice of appeal. (Doc. No. 78). They raise four assignments of error for our review. We begin by addressing the Co-Trustees' second and third assignments of error together because our resolution of these assignments of error is dispositive of this appeal and they concern related issues.

### Assignment of Error No. II

**The trial court erred when it found that a valid and enforceable option contract for the sale of land existed that satisfied the statute of frauds and entered judgment in favor of Plaintiff instead of Defendants.**

### Assignment of Error No. III

**The trial court erred when it found part performance exempted the document from the statute of frauds and permitted the trial court to enforce an alleged oral contract and entered judgment in favor of Plaintiff instead of Defendants.**

{¶21} In their second and third assignments of error, the Co-Trustees argue that the trial court erred when it overruled two of their objections to the magistrate's decision. Specifically, in their second assignment of error, the Co-Trustees argue that the trial court erred by concluding that the magistrate had correctly determined that the document Canter and Garvin reviewed in April 2009 contained the essential

terms of their alleged contract, thereby satisfying the requirements of the statute of frauds. In their third assignment of error, the Co-Trustees argue that the trial court erred by determining that the magistrate had correctly concluded that, even if the writing failed to satisfy the statute of frauds, the doctrine of part performance permits enforcement of the alleged contract.

{¶22} Generally, "[a]n appellate court reviews the trial court's decision to adopt, reject or modify the Magistrate's decision under an abuse of discretion standard." *Tewalt v. Peacock*, 3d Dist. Shelby No. 17-10-18, 2011-Ohio-1726, ¶ 31, citing *Figel v. Figel*, 3d Dist. Mercer No. 10-08-14, 2009-Ohio-1659, ¶ 9, citing *Marchel v. Marchel*, 160 Ohio App.3d 240, 2005-Ohio-1499, ¶ 7 (8th Dist.). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). However, "[w]here an appeal from the trial court's action on a magistrate's decision * * * presents only a question of law, * * * we review that question de novo." *Brunetto v. Curtis*, 10th Dist. Franklin No. 10AP-799, 2011-Ohio-1610, ¶ 10, citing *Shah v. Smith*, 181 Ohio App.3d 264, 2009-Ohio-743, ¶ 7 (1st Dist.). "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25, citing *Costner Consulting Co. v. U.S. Bancorp*, 195 Ohio App.3d 477, 2011-Ohio-3822, ¶ 10 (10th Dist.).

{¶23} Initially, we note that at the trial court level, Canter was less than clear about the type of contract he claims to have entered into with Garvin. That is, he alternated between describing the contract as a contract for the sale of part of the Farm and describing the contract as an option contract giving him the right, but not an obligation, to buy part of the Farm. For example, in his written closing arguments, Canter alleged that he "had an agreement with [Garvin] to purchase the [Farm] * * * for two hundred thousand dollars * * *." (Doc. No. 59). However, later in the same paragraph, Canter stated that "[t]he agreement provided [him] the right to purchase the [F]arm for that price * * *." (*Id.*). Similarly, Canter later maintained in his closing arguments that "[t]here was an offer, acceptance, and consideration for the purchase of the property for $200,000," but just one page later, he insisted that he "had the right to purchase the [F]arm for $200,000 * * *." (*Id.*).

{¶24} The magistrate and the trial court only compounded Canter's conceptual confusion. In his decision, the magistrate ultimately concluded that Canter and Garvin "entered into a contract for the sale of certain real estate" and recommended that "the contract for the sale of real estate between [Garvin] and [Canter] be specifically enforced." (Doc. No. 61). Yet, throughout his decision, the magistrate also referred to Canter's "right" to purchase part of the Farm, and he once described the land marked by the painted fence posts as "the property that [Canter] *could buy* for $200,000" rather than as the property that Canter had bought for

$200,000. (Emphasis added.) (*Id.*). Likewise, the trial court concluded that Canter and Garvin "entered into a contract for the sale of land," but later held that the writing Canter and Garvin reviewed in April 2009 "set forth that [Canter] had the right to purchase [a] portion of [the Farm]" and that the work Canter performed at the Farm was to his detriment "unless and until he was able to exercise his option to purchase the [F]arm." (Doc. No. 72).

{¶25} However, whatever ambiguity existed in earlier proceedings with respect to the identity of Canter and Garvin's alleged contract, it now appears that the parties are generally in agreement that the alleged contract should be analyzed as an option contract. Most of the Co-Trustees' arguments on appeal rely to some extent on characterizing Canter and Garvin's alleged contract as an option contract. (*See* Appellants' Brief at 1-2, 5, 9, 14-23). Furthermore, though Canter begins his appellate brief by describing his alleged contract with Garvin as "an agreement * * * to purchase a portion of the [Farm] * * * for two hundred thousand dollars," he does not challenge the Co-Trustees' characterization of the alleged contract as an option contract. In fact, in countering one of the Co-Trustees' arguments, Canter talks about exercising an option. (*See* Appellee's Brief at 23-24) ("[T]he notion that [Canter] failed to exercise the option is intellectually dishonest. * * * The fact is that [Canter] would not have initiated litigation if he was permitted by [the Co-Trustees] to exercise the option."). Therefore, in considering whether Canter and

Garvin's alleged contract satisfied the requirements of the statute of frauds, or, alternatively, whether the doctrine of part performance removes their alleged contract from operation of the statute, we will regard the alleged contract as an option contract rather than as a contract for the sale of land. With this in mind, we now review the trial court's determinations concerning the writing's compliance with the statute of frauds.

{¶26} "'In general, the term "statute of frauds" refers to a provision that requires that certain agreements be in writing.'" *LHPT Columbus, L.L.C. v. Capitol City Cardiology, Inc.*, 10th Dist. Franklin No. 14AP-264, 2014-Ohio-5247, ¶ 18, quoting *ELM Invests., Inc. v. BP Exploration & Oil, Inc.*, 10th Dist. Franklin No. 11AP-1000, 2012-Ohio-2950, ¶ 11. "In Ohio, the General Assembly codified the statute of frauds in R.C. Chapter 1335." *Id.*, citing *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 438 (1996). As relevant to this case, R.C. 1335.05 provides:

> No action shall be brought whereby to charge the defendant * * * upon
>
> a contract or sale of lands, tenements, or hereditaments, or interest in
>
> or concerning them * * * unless the agreement upon which such action
>
> is brought, or some memorandum or note thereof, is in writing and
>
> signed by the party to be charged therewith or some other person
>
> thereunto by him or her lawfully authorized.

-17-

"Pursuant to R.C. 1335.05, options to purchase real property fall within the statute of frauds." *Stickney v. Tullis-Vermillion*, 165 Ohio App.3d 480, 2006-Ohio-842, ¶ 22 (2d Dist.), citing *Ridge Stone Builders & Developers, Ltd. v. Gribbin*, 6th Dist. Wood No. WD-03-009, 2003-Ohio-5188, ¶ 23 and *Hubbard v. Dillingham*, 12th Dist. Butler No. CA2002-02-045, 2003-Ohio-1443, ¶ 21. *See Michel v. Bush*, 146 Ohio App.3d 208, 212 (9th Dist.2001) (holding that R.C. 1335.05 applied to an "option/right of first refusal" allegedly written in the margins of a written lease agreement).

{¶27} "The purpose of the statute of frauds is to prevent 'frauds and perjuries.'" *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, ¶ 33, quoting *Wilber v. Paine*, 1 Ohio 251, 255 (1824).

> By requiring that contracts concerning real estate be evidenced by a signed writing, the statute of frauds "'serves to ensure that transactions involving realty interests are commemorated with sufficient solemnity. A signed writing provides greater assurance that the parties and the public can reliably know when such a transaction occurs. It supports the public policy favoring clarity in determining real estate interests and discourages indefinite or fraudulent claims about such interests.' * * * If a contract falling under the statute of

frauds is not properly memorialized in a signed writing, the effect of the statute is to render an otherwise valid contract unenforceable." *Stickney* at ¶ 23, quoting *Beaverpark Assocs. v. Larry Stein Realty Co.*, 2d Dist. Montgomery No. 14950, 1995 WL 516469, \*3 (Aug. 30, 1995), quoting *N. Coast Cookies, Inc. v. Sweet Temptations, Inc.*, 16 Ohio App.3d 342, 348 (8th Dist.1984).

**{¶28}** To satisfy the statute of frauds, "[t]he writing does not need to contain all the terms of the agreement between the parties." *6610 Cummings Court, L.L.C. v. Scott*, 8th Dist. Cuyahoga Nos. 106803 and 106804, 2018-Ohio-4870, ¶ 39, citing *N. Coast Cookies* at 349, citing *Normandy Place Assocs. v. Beyer*, 2 Ohio St.3d 102 (1982). Instead, "'"[a]ny signed memorandum is sufficient to satisfy the Statute of Frauds so long as it (1) identifies the subject matter of the agreement, (2) establishes that a contract has been made, and (3) states the essential terms with reasonable certainty."'" *LHPT Columbus* at ¶ 22, quoting *Lamkin v. First Community Bank*, 10th Dist. Franklin No. 00AP-935, 2001 WL 300732 (Mar. 29, 2001), quoting *Busler v. D & H Mfg., Inc.*, 81 Ohio App.3d 385, 389 (10th Dist.1992), citing *N. Coast Cookies* at 349. "As to essential terms, the essential terms of a contract are 'the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term.'" *Mezher v. Schrand*, 1st Dist. Hamilton No. C-180071, 2018-Ohio-3787, ¶ 8, quoting *Alligood v. Procter & Gamble Co.*, 72 Ohio App.3d 309, 311 (1st Dist.1991). "'If the writing does not

contain words which can reasonably be construed as words of promise or agreement, the writing is not a memorandum for purposes of the Statute of Frauds.'" *Stickney* at ¶ 24, quoting *Lacy v. Adair*, 2d Dist. Greene No. 89 CA 0018, 1989 WL 150809, *2 (Nov. 22, 1989); *Sherman v. Johnson*, 159 Ohio St. 209 (1953), paragraph two of the syllabus; *Kling v. Bordner*, 65 Ohio St. 86 (1901).

**{¶29}** Whether a document complies with the statute of frauds is a question of law, which we review de novo. *LHPT Columbus*, 2014-Ohio-5247, at ¶ 21, citing *Fontbank, Inc. v. CompuServe, Inc.*, 138 Ohio App.3d 801, 812 (10th Dist.2000), citing *Ruhe v. Hemmelgarn*, 2d Dist. Darke No. 96-CA-1423, 1997 WL 476687 (Aug. 22, 1997), and citing *State v. Evans*, 10th Dist. Franklin No. 13AP-939, 2014-Ohio-2081, ¶ 9. *See Peoples v. Holley*, 181 Ohio App.3d 203, 2009-Ohio-897, ¶ 20 (2d Dist.).

**{¶30}** In this case, it is undisputed that if a writing evidencing the alleged option contract between Canter and Garvin ever existed, it has been lost or inadvertently destroyed. Therefore, to prove that such a writing existed and that the writing complied with the statute of frauds, Canter introduced his own recollections of the writing's contents, testimony of other people who allegedly saw the writing and recalled its contents, and testimony about statements Garvin made concerning the contents of the writing.[2]

---

[2] Typically, where a party seeks to prove the contents of a writing, the party is required to submit the original writing or, in lieu of the original writing, a sufficiently reliable duplicate of the original writing. Evid.R.

{¶31} Canter was the first to testify about the contents of the alleged writing. As indicated above, Canter testified that the writing stated, "John Garvin, Trustee, gives Clay Canter the right to purchase my farm at $200,000," and Canter stated that the writing specified that this right would be effective upon Garvin's death. (July 13, 2017 Tr., Vol. I, at 42, 97). Canter also testified that the writing described approximately 100 acres and that the writing was signed by Garvin. (*Id.* at 42). Apart from other details irrelevant to determining whether the writing complied with the statute of frauds, such as the color of the paper or the presence of letterhead, Canter could remember nothing more about the writing or its contents. (*Id.* at 42-43).

{¶32} To make up for some of the deficits in his personal memory of the writing and its contents, Canter also testified about what Garvin said the writing said when Garvin read it aloud in April 2009.[3] Canter stated that Garvin's reading of the document confirmed that "it gave him the right to purchase the [F]arm." (*Id.* at 43). Canter also testified that Garvin thoroughly explained the writing's description of the land that was the subject of the alleged contract, including the fact that two red-

---

1002 and 1003. However, this court has previously held that when an original writing has been lost or destroyed, a party may use other evidence to prove that the writing existed and to demonstrate that the contents of the writing satisfied the requirements of the statute of frauds. *Criswell v. Criswell*, 3d Dist. Marion No. 9-11-57, 2012-Ohio-3065, ¶ 24-25.

[3] In their first assignment of error, the Co-Trustees argue that this testimony and other testimony about things Garvin said to other witnesses about his alleged agreement with Canter and the contents of the writing constitute inadmissible hearsay. However, solely for purposes of the Co-Trustees' second and third assignments of error, we assume without deciding that the magistrate and trial court did not err by admitting this testimony to determine whether the writing satisfied the requirements of the statute of frauds.

painted fence posts would be placed as reference points. (*Id.*). However, with respect to the work that Garvin allegedly wanted Canter to do as part of the agreement, Canter suggested that the work was not described anywhere in the writing and that Garvin mentioned the work only after he had finished reading the writing. (*See id.* at 45, 107). When asked whether there was "any document that exists that says that work was done in exchange for [Garvin] agreeing to sell * * * for $200,000," Canter responded that "there is no document." (*Id.* at 101-103). He confirmed that his conversation with Garvin about the work occurred after he saw the writing. (*Id.*).

{¶33} In addition, Ruth, Taylor, and Jesse testified about the alleged contents of the writing. Ruth testified that Garvin once showed her a piece of "yellow tablet paper with pencil" that said that Garvin "was giving [Canter] the right to purchase the [F]arm upon [Garvin's] death." (*Id.* at 128). Moreover, in the following exchange, Ruth testified about her memory of what Garvin read to Canter in April 2009:

[Canter's Counsel]: Do you remember hearing anything that [Garvin] read from that document?

[Ruth]: Not exactly, no.

[Canter's Counsel]: I understand you don't remember exactly. Was there anything that stuck in your mind that you recall all these years?

[Ruth]: Nothing more than just he thought he would like for [Canter] to buy it.

[Canter's Counsel]: For $200,000?

[Ruth]: Yes.

* * *

[Canter's Counsel]: [U]pon his death is when [Canter] would buy it. Do you recall that?

[Ruth]: [Garvin] didn't say one way or the other but he wanted to retain ownership until his death.

(*Id.* at 133-134). Ruth testified that the writing she saw was signed by Garvin. (*Id.* at 134).

{¶34} As for Taylor, she testified that she once saw a handwritten document in Garvin's house that said that "Clay Canter was going to be given the right to buy the farmland." (July 13, 2017 Tr., Vol. I, at 140). She also remembered that the document was signed by Garvin. (*Id.*). However, Taylor could not recall whether the writing featured the word "agreement," whether it said anything about a price for the Farm, or whether it said anything about when Canter could buy the Farm.

(*Id.* at 144). Finally, Jesse testified that he once saw a typewritten document inside of Garvin's house that "mentioned a trust" and said that "Trustor had given permission to * * * Canter * * * to purchase the property for $200,000." (July 13, 2017 Tr., Vol. II, at 167). However, at another point in his testimony, Jesse stated that the writing said that "there was an agreement for $200,000 for purchase." (*Id.* at 169). When asked whether the writing used the word "permission" or the word "agreement," Jesse seemed to suggest that he was merely paraphrasing the writing, saying that "it's just the words that [he] used." (*Id.*). Moreover, Jesse could not remember "the exact wording of it" and he did "not remember [the writing] as a whole," but he stated that the writing "had the directions of the posts" and was signed by Garvin. (*Id.* at 167, 169).

{¶35} With this evidence, the magistrate could have decided whether the writing complied with the statute of frauds. Yet, the magistrate did not definitively conclude whether the writing satisfied the statute of frauds, concluding instead that the doctrine of part performance entitles Canter to relief irrespective of compliance with the statute of frauds. (Doc. No. 61). The magistrate questioned whether Garvin "in drafting the document was acting in his individual capacity or as trustee of the [Trust]" and he observed that if Garvin "was not acting in his fiduciary capacity, then there would be no compliance with the statute of frauds." (*Id.*). Nonetheless, aside from his doubts about whether Garvin was acting in his individual or fiduciary

capacity when he and Canter allegedly entered into the agreement, the magistrate was seemingly satisfied that the writing otherwise complied with the statute of frauds. He found that "the parties intended to be bound. The essential terms of the agreement were set forth in the writing." (*Id.*). In overruling the Co-Trustees' objection to this determination, the trial court ultimately reached a similar conclusion:

> [A] writing existed and the contents thereof set forth that [Canter] had the right to purchase the portion of [the Farm] marked by the red stakes after [Garvin's] death for $200,000. While the additional work to be done on the [F]arm later added as consideration was not a part of the writing, the Court finds that all essential terms of the agreement were contained in the writing.

(Doc. No. 72).

{¶36} However, both the magistrate and the trial court were mistaken—at least one of the essential terms of the alleged option contract was not contained in the writing. Canter's own testimony supports that if he did in fact have an agreement with Garvin, the work he performed at the Farm was an essential term of that agreement. Canter consistently testified that the work was "part of the contract" or "part of the agreement—the terms on the [F]arm." (July 13, 2017 Tr., Vol. I, at 45);

(July 14, 2017 Tr. at 5). He also insisted that he performed the work "in exchange for what that piece of paper said * * *." (July 13, 2017 Tr., Vol. I, at 101).

{¶37} Because Canter repeatedly stated that the work was part of his alleged agreement with Garvin and that he performed the work in exchange for the rights allegedly set forth in the writing, we believe that the trial court was correct when it noted that the work constituted consideration for the alleged contract. In fact, since Canter also testified that he did not give Garvin "any money or a check or anything of value on [the] date of the alleged agreement" and that there was "[j]ust work" after the date of the alleged agreement, this work, or Canter's promise to complete the work, is the only possible consideration for the alleged option contract. (July 13, 2017 Tr., Vol. I, at 100, 108). As the consideration for the alleged option contract, the work was clearly an integral term of the alleged contract; without it, the alleged contract would be nothing more than an alleged non-binding promise or offer. *See Plikerd v. Mongeluzzo*, 73 Ohio App.3d 115, 122-123 (3d Dist.1992) ("'An option to be effective and not revocable must be based upon a consideration. The consideration for the option contract is something other and independent of the consideration that will pass between the parties in the event that the option is exercised.'"), quoting 17 Ohio Jurisprudence 3d, Contracts, Section 22, at 453-455 (1980). Thus, contrary to the trial court's conclusion, the writing did not contain

the essential terms of Canter and Garvin's alleged contract *because* it failed to reference the additional work to be done at the Farm.

{¶38} Moreover, without referencing the additional work, there was nothing in the writing demonstrating that *any* type of agreement was reached by Canter and Garvin, whether that agreement be a contract for the sale of land or an option contract. The writing did not indicate that Canter and Garvin actually reached an agreement whereby Canter purchased a portion of the Farm from the Trust for $200,000. At best, the language in the writing supported that Garvin had offered to sell Canter part of the Farm for $200,000 and that the offer could be accepted after Garvin died. The writing did not evidence that Canter had accepted an offer to buy a portion of the Farm for $200,000. Furthermore, though the writing supported that Canter may have been granted the right to purchase part of the Farm, it did not contain language sufficient to show that Canter acquired this right as part of a contract with Garvin. Statements in the writing that Canter had been "give[n] * * * the right to purchase [the Farm] at $200,000," that Garvin "was giving [Canter] the right to purchase the [F]arm," or that Canter "was going to be given the right to buy the farmland" were as consistent with the making of a gratuitous promise as they were with the formation of a legally binding option contract. Without a statement that the right to purchase had been, or was to be, given in exchange for the work at the Farm, or some other consideration, the writing did not contain words which

could be reasonably construed as indicating that Canter and Garvin entered into a binding option contract. *See Sherman*, 159 Ohio St. 209, at paragraph two of the syllabus.

{¶39} In sum, because Canter was unable to produce a writing evidencing the alleged option contract, he was required to prove both that such a writing once existed and that it satisfied the requirements of the statute of frauds. Assuming that Canter's evidence was sufficient to show that a writing once existed and that this evidence proved all of the writing's contents, the writing failed to contain the essential terms of the alleged option contract. As a result, we conclude that the trial court erred by determining that the writing contained the essential terms of the alleged option contract. Accordingly, the trial court should have sustained the Co-Trustees' objection to the magistrate's conclusion that the writing did contain the essential terms of the alleged contract. Furthermore, given our conclusion that the writing did not contain the essential terms of the alleged option contract, we must conclude that the writing failed to comply with the requirements of the statute of frauds.

{¶40} Although we conclude that the writing evidencing the alleged option contract did not satisfy the requirements of the statute of frauds, the alleged option contract may yet be enforceable under the doctrine of part performance. "In an action for specific performance, part performance is an equitable doctrine that

renders the Statute of Frauds inoperative." *Bumgarner v. Bumgarner*, 4th Dist. Highland No. 09CA22, 2010-Ohio-1894, ¶ 26, citing *Jones v. Bonzo*, 4th Dist. Lawrence No. 1977, 1991 WL 224159, *4 (Oct. 30, 1991), citing *Tier v. Singrey*, 154 Ohio St. 521 (1951). The doctrine of part performance "'is applied in situations where it would be inequitable to permit the statute [of frauds] to operate and where the acts done sufficiently establish the alleged agreement to provide a safeguard against fraud in lieu of the statutory requirements.'" *Tower 10, LLC v. 10 W Broad Owner, LLC*, 10th Dist. Franklin Nos. 18AP-998 and 18AP-999, 2020-Ohio-3554, ¶ 40, quoting *Delfino v. Paul Davies Chevrolet, Inc.*, 2 Ohio St.2d 282, 286-287 (1965).

{¶41} "To remove an agreement from the requirements of the statute of frauds, part performance 'must consist of unequivocal acts by the party relying upon the agreement, which are exclusively referable to the agreement and which have changed his position to his detriment and make it impossible or impractical to place the parties in statu quo.'" *OBLH, L.L.C. v. O'Brien*, 11th Dist. Trumbull No. 2013-T-0111, 2015-Ohio-1208, ¶ 21, quoting *Delfino* at 287, citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 339 (1954). "If the performance can reasonably be accounted for in any other manner or if plaintiff has not altered his position in reliance on the agreement, the case remains within the operation of the statute." *Delfino* at 287.

"[A]cts which do not unmistakably point to a contract existing between the parties, or which can be reasonably accounted for in some other manner than as having been done in pursuance of a contract, do not constitute a part performance sufficient in any case to take it out of the operation of the statute [of frauds], even though a verbal agreement has actually been made between the parties."

*JP Morgan Chase Bank, N.A. v. Spears*, 3d Dist. Shelby No. 17-17-10, 2018-Ohio-917, ¶ 14, quoting *Hughes* at 339-340.

{¶42} With respect to contracts concerning interests in real estate, "Ohio courts generally consider the following factors to be relevant in determining the applicability of the part performance doctrine: (1) evidence of a change in possession; (2) payment of all or part of the consideration for the land; and (3) improvements, alterations or repairs upon the land by the possessor." *Monea v. Lanci*, 5th Dist. Stark No. 2009-CA-0083, 2009-Ohio-6446, ¶ 21, citing *Brown v. Brown*, 5th Dist. Knox No. 04CA000018, 2005-Ohio-1838, ¶ 29. Courts accept a combination of these elements in determining whether to apply the doctrine of part performance. *See Dinunzio v. Murray*, 11th Dist. Lake No. 2003-L-213, 2005-Ohio-4047, ¶ 30, citing *Rolland v. Biro*, 8th Dist. Cuyahoga No. 44632, 1982 WL 2547, *4 (Nov. 18, 1982). However, it is generally accepted that the presence of one of these factors, standing alone, is not sufficient to remove an agreement from

the operation of the statute of frauds. *See Tier* at 526 ("Possession alone is not sufficient to remove [a] sale from the operation of the statute of frauds."); *Monea* at ¶ 21 ("Neither mere possession of the real property, nor payment of consideration is by itself sufficient to avoid the applicability of the statute of frauds."), citing *Tier* at 526, *Snyder v. Warde*, 151 Ohio St. 426, 434 (1949), and *Crabill v. Marsh*, 38 Ohio St. 331, 338 (1882); *Potts v. Potts*, 72 Ohio App. 268, 273 (3d Dist.1942) ("It has long been well settled that mere payment of part of the purchase money of lands * * * does not take the contract out of the statute of frauds, and this rule applies whether the payment be made in money or services.").

{¶43} "'Determining whether the trial court correctly applied * * * the doctrine of part[] performance is a matter of law.'" *Verhoff v. Verhoff*, 3d Dist. Allen No. 1-18-66, 2019-Ohio-3836, ¶ 21, quoting *Crilow v. Wright*, 5th Dist. Holmes No. 10 CA 10, 2011-Ohio-159, ¶ 27. As a result, we determine whether the trial court correctly applied the doctrine of part performance under a de novo standard of review. *Id.*, citing *Ruhe*, 1997 WL 476687, at *3 and *LHPT Columbus*, 2014-Ohio-5247, at ¶ 21. *Contra Bumgarner*, 2010-Ohio-1894, at ¶ 26 ("Although the facts establishing part performance must be established by clear and convincing evidence, * * * the ultimate decision to apply equitable doctrines [such as the doctrine of part performance] is generally left to the discretion of the trial court and

we review it under the abuse of discretion standard."), citing *Home Natl. Bank v. Buckallew*, 4th Dist. Meigs Nos. 06CA2 and 06CA3, 2007-Ohio-1339, ¶ 34.

{¶44} In his decision, the magistrate made the following conclusions with respect to Canter's part performance of the alleged option contract:

> The Court finds that [Canter] performed substantial work on the farm at [Garvin's] request. The work performed was for no compensation as [Garvin] deemed this part of the deal if [Canter] wanted the opportunity to buy the farm. The work took place over a number of years and was substantial. [Canter] and his wife financed the cost of the work performed. As a result, their economic position was altered by their substantial investment to perform work. * * * [Canter] performed substantial work on the farm over a period of years. The work was performed in reliance of the contract. Considering the fact that many trees were removed, a stream diverted, old fences removed, new fences installed, and land re-graded and seeded, [Garvin] had to know that the work was being performed on his property. [Garvin] acquiesced in these improvements. In such a situation, the equitable doctrine of part performance applies to take the transaction out of the statute of frauds.

(Doc. No. 61).

{¶45} In its judgment overruling the Co-Trustees' objection to the magistrate's determination, the trial court similarly concluded:

[The Co-Trustees] assert that more than improvements, alterations or repairs is required to establish part performance. The Court finds that [Canter] provided extensive work on the farm at the request of [Garvin] for no compensation. That work was to the detriment of [Canter] unless and until he was able to exercise his option to purchase the farm. This is work that [Garvin] certainly knew was occurring on his farm. The Court finds that the equitable doctrine of part performance applies to take this transaction out of the statute of frauds.

(Doc. No. 72).

{¶46} We agree with the magistrate and with the trial court that the work performed by Canter was substantial. We also agree that by performing the work at the Farm for no remuneration, Canter altered his economic position to his detriment. However, the substantiality of a party's acts allegedly done in pursuance of a contract, or a detrimental change in the performing party's economic position caused by performance of the acts, do not, by themselves, support application of the doctrine of part performance. Instead, the performing party's acts, even if substantial and financially burdensome, must be exclusively or unmistakably

referable to a contract existing between the parties. If the performing party's acts can be reasonably accounted for in another manner than as having been done in pursuance of a contract, such acts do not constitute part performance sufficient to take the alleged contract out of the operation of the statute of frauds. Here, the magistrate and the trial court seemingly failed to consider whether the work Canter performed at the Farm was exclusively referable to an option contract entered into by Canter and Garvin, and as a result, the magistrate's and trial court's analyses were incomplete. After reviewing the record, we believe that the work Canter performed at the Farm can be reasonably accounted for in any one of three different ways, or a combination of them.

{¶47} First, the record supports that some of the work Canter performed benefitted him as a lessee of part of the Farm. While it is clear that much of the work Canter performed was on land that he did not rent or that was rented by Regula, some of the work was done on land that he did rent, and this work was of value to his cattle-raising operation. For example, with respect to the eroded creek banks that he restored, Canter identified a number of factors that could have potentially caused the erosion, but he was confident that some of the erosion was caused by his cattle. (July 13, 2017 Tr., Vol. I, at 103). Vicky agreed that the work Canter performed provided his cattle with better access to water, and she also agreed that other work Canter performed "opened it up so [his] cows would have a place to

feed." (July 13, 2017 Tr., Vol. II, at 193). However, she stated that "that was a lot of money to invest for [those] purpose[s]." (*Id.*). Another example is Canter's act of replacing some of the fencing at the Farm. Canter stated that when he was performing some of the other work at the Farm, he took down an existing fence with the excavator. (July 13, 2017 Tr., Vol. I, at 102). Canter testified that in order to keep cattle at the Farm, the area in which the cattle were kept needed to be fenced in. (*Id.*). Therefore, to continue raising cattle at the Farm, the fence that was torn down needed to be replaced. By replacing the fence, Canter was able to continue raising cattle at the Farm, and he therefore derived a personal benefit from replacing the fence.

{¶48} In addition, the record demonstrates that Canter regularly provided services to Garvin without receiving compensation. As Canter testified:

A lot of work I did free. I cut all his firewood for his house. I carried salt down in the basement. I mowed his orchards. I worked on his farm equipment. I dug electric lines from the woodshed to his house. I carried toilets up. I filled it up to replace the toilet upstairs. I've shoveled the snow every year there for the sidewalks—all the sidewalks every year. I plowed the drive every year. I planted his garden. I plowed with the disc tractor. Disced [sic] it with his tractor. Planted it. Grew the crops for at least six years prior to the last six

years completely. And we carried the vegetables and stuff up to the

house. And I considered that all things of friendship.

(July 14, 2017 Tr. at 54-55). We acknowledge that the work Canter allegedly did in pursuance of the option contract was apparently more costly and more extensive than the other services he provided to Garvin at no cost. Nonetheless, the work Canter purports to have done for Garvin as part of the alleged contract was not wholly inconsistent with his history of doing work for Garvin for free.

{¶49} Finally, the record supports that Garvin may have actually intended to pay Canter for the work he performed at the Farm. Although Canter insisted that he did not want to get paid for the work he performed at the Farm, he testified that "[Garvin] had actually offered to pay [him] for different things," but he told Garvin "with the agreement on the Farm, [he] didn't feel it was right." (*Id.* at 54). As one could query why Garvin would offer to pay Canter for the work if the work was indeed consideration for a contract giving Canter the right to buy part of the Farm, a different understanding under which Garvin would pay Canter for the work performed, though payment was ultimately rejected by Canter, supplies an additional plausible explanation for Canter's performance.

{¶50} In light of the foregoing, we cannot conclude that the work performed by Canter at the Farm was exclusively referable to an option contract existing between Canter and Garvin. Accordingly, we are inclined to conclude that the

doctrine of part performance does not apply to remove the alleged option contract from the operation of the statute of frauds. Our inclination is made all the stronger when we look to the factors that courts generally consider when determining whether the doctrine of part performance applies—possession of the land, payment of all or part of the consideration for the land, and improvements or repairs made upon the land.

{¶51} Regarding Canter's possession of the Farm, it is undisputed that Canter possessed, or at least exercised some control over, a portion of the Farm. However, as this court explained in *Potts*,

> In order that possession may take a lease or contract for the sale of land out of the operation of the statute [of frauds], the possession must be definite and exclusive; it must unequivocally show what land is possessed, and that it is possessed by the purchaser exclusively and not concurrently with the vendor. It must, in short, indicate the commencement of a new interest in the estate.
>
> The joint or concurrent possession of land by both the vendor and vendee, is not sufficient to take a parol contract of sale out of the operation of [the statute of frauds]. To have such effect the possession of the vendee must be definite and exclusive.

(Citations omitted.) 72 Ohio App. at 273. Here, Canter's possession of part of the Farm after the date of the formation of the alleged option contract does not indicate the commencement of a new interest in the Farm. Canter initially entered upon the Farm in 2003 pursuant to some sort of verbal agreement with Garvin and remained on the Farm under a similar arrangement after he allegedly acquired the right to purchase part of the Farm from the Trust. Thus, although Canter presented evidence that he possessed part of the Farm, he did not demonstrate that this possession was a change from that which he enjoyed as Garvin's tenant. *See Mishler v. Hale*, 2d Dist. Montgomery No. 25962, 2014-Ohio-5805, ¶ 27 ("Hale presented evidence that he had possession of the house, but this was not a change from the possession he held as a lessee.").

{¶52} In addition, with respect to whether Canter paid all or part of the alleged $200,000 purchase price, the record reflects that Canter never paid any part of the $200,000 to Garvin or to the Trust. Vicky testified that there "hasn't been any money paid" by her or Canter to Garvin or the Trust for purchase of part of the Farm. (July 13, 2017 Tr., Vol. II, at 192-193). While Vicky stated that there was money "available and in the bank" to purchase part of the Farm, she conceded that they had never tendered a check for $200,000 to Garvin or the Trust. (*Id.* at 194-195). She agreed that she and Canter "never paid them one dollar * * * for [this]

property," but explained that "[Garvin] never asked to be paid in advance." (*Id.* at 195).

{¶53} Finally, the improvements made by Canter at the Farm cannot alone sustain the application of the doctrine of part performance. First, as discussed above, some of the improvements made by Canter benefitted his cattle operation and were consistent with his status as Garvin's tenant. Additionally, "[i]mprovements made by a purchaser under an oral contract must be of such a character as to be incapable of compensation in damages in order to constitute part performance of such contract sufficient to take it out of the operation of the statute [of frauds]." *Potts* at 273. In this case, Canter performed significant work at the Farm, including tearing down many trees, rerouting a creek, and leveling ground. However, Canter failed to show that the work he did at the Farm and the improvements he made are of such character as to be incapable of compensation in damages. Though we stop short of holding that the doctrine of part performance can never be applied if a party can be compensated in money for improvements made to real estate, where, as here, such improvements are not accompanied by qualifying possession of the land or payment of any part of the consideration, we believe that application of the doctrine of part performance is not warranted.

{¶54} Accordingly, we conclude that the trial court erred by concluding that the doctrine of part performance applies to remove the alleged option contract from

the operation of the statute of frauds. Consequently, the trial court should have sustained the Co-Trustees' objection relating to the magistrate's conclusions about the applicability of the doctrine of part performance. Because the writing evidencing the alleged option contract did not satisfy the requirements of the statute of frauds and the doctrine of part performance does not apply, the alleged option contract between Canter and Garvin is not legally enforceable.

{¶55} The Co-Trustees' second and third assignments of error are sustained.

### Assignment of Error No. I

**The trial court erred when it admitted the statements of John L. Garvin, Sr., a former trustee deceased at the time of trial, to prove the contents of the alleged writing or any alleged agreement.**

### Assignment of Error No. IV

**The trial court erred when it ordered specific performance because Mr. Canter never exercised the option and the purported contract lacked completeness and certainty and when it entered judgment in favor of Plaintiff instead of Defendants.**

{¶56} In light of our resolution of the Co-Trustees' second and third assignments of error, the Co-Trustees' remaining assignments of error are rendered moot, and accordingly, we need not address them.

{¶57} Having found error prejudicial to the appellants herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand to the trial court for further proceedings consistent with this opinion.

***Judgment Reversed and***
***Cause Remanded***

**SHAW, J., concurs.**

**/jlr**

**WILLAMOWSKI, P.J., concurring separately.**

{¶58} In this case, Canter and Garvin entered into an option contract that was partially reduced to writing. However, the consideration for this option contract was agreed to orally and was not included in the writing. Since this writing did not contain an essential term of the option contract, I fully agree with the majority that this writing does not comply with the statute of frauds and that this option contract is not enforceable at law.

{¶59} Since this agreement is not enforceable at law, we must examine the arguments of the parties as to whether this agreement is enforceable in equity under the doctrine of partial performance. This doctrine "removes a contract from the operation of the statute of frauds" if partial performance of the agreement (1) "consist[ed] of unequivocal acts by the party relying on the agreement" (2) that "are exclusively referable to the agreement" (3) that "have changed his position to his

detriment" (4) and that "make it impossible or impracticable" to return the parties to the status quo ante. *Verhoff, supra,* at ¶ 19, quoting *JP Morgan Chase Bank, N.A. v. Spears*, 3d Dist. Shelby No. 17-17-10, 2018-Ohio-917, ¶ 14.

{¶60} In this case, I agree with the majority that Canter failed to establish that it is "impossible or impracticable" to return the parties to the status quo ante. *Verhoff, supra*, at ¶ 19. *See* Majority, *supra*, at ¶ 54. Since he failed to establish this fourth element, the doctrine of partial performance is inapplicable and does not remove this option contract from the operation of the statute of frauds. I concur separately because the failure of the fourth element of the doctrine of partial performance negates the need to consider the application of the third element— whether the work Canter performed on Garvin's land was "exclusively referable to the agreement." It is not necessary to the disposition of this case and I would not, therefore, discuss, consider nor determine it. *Verhoff*, *supra*, at ¶ 19.

{¶61} Further, in determining whether the doctrine of partial performance removes a contract from the operation of the statute of frauds, Ohio courts are also to consider whether the following three factors are present in that case:

> **'(1) evidence of a change in who possesses the land, (2) payment of all or part of the consideration for the land, and (3) improvements, alterations or repairs upon the land.' Accord 51 Ohio Jurisprudence 3d (1984) 320, Frauds, Statute of, Section 171. Generally, the performance of only one of the three acts is insufficient to establish part performance.**

*Areawide Home Builders, Inc. v. Hershberger Const., Inc*., 9th Dist. Summit No. 18514, 1998 WL 65476, *3 (Feb. 4, 1998), quoting *Geiger v. Geiger*, 2d Dist. Montgomery No. 13841, 1993 WL 476247, *4 (Nov. 16, 1993). While the majority considers this case under these factors, this analysis is not necessary to the disposition of the issues before this Court because Canter has already failed to establish the fourth element of the doctrine of partial performance, thus preventing equitable enforcement of the option contract. In my opinion, these factors are, as a general matter, more indicative of whether a purchase or lease agreement has been entered into by the parties. An option contract will not usually result in a change in possession of the land. This reality raises questions as to how these factors should be applied—or whether these factors should be applied—in the context of an option contract. Answers to these questions should be reserved for a case in which their resolution is necessary.

{¶62} For the foregoing reasons, I concur separately.